STATE v. DOC. BRIDGERS.

(Filed 13 September, 1916.)

**1. Homicide—Murder—Circumstantial Evidence—Motive.**

Where there is no direct proof that the prisoner on trial for murder committed the crime with which he is charged, and recourse is had to circumstantial evidence, the question of motive is properly considered in the chain of proof.

**2. Same—Identification—Trials—Evidence—Questions for Jury.**

Upon a trial for murder there was evidence tending to show that the deceased, a married woman, was the paramour of the prisoner; that he was the last seen with her when she was going to her husband's home, and was afterwards seen no more alive, but was discovered murdered near the place he had been with her; that he was jealous of her husband and threatened her life, and to take from her feet shoes he had given her, should she go back to him; that he told a witness of the deceased if she were found dead the witness would know who killed her; that he said, after her disappearance, that he knew where she was, but would not say for fear the witness would tell; that when the body was found, shoes that the prisoner had given her had been taken from her feet in accordance with his previous threat, etc. *Held*, sufficient to identify the prisoner as the murderer and sustain a verdict of murder in the second degree.

INDICTMENT for murder, tried before *Lyon, J.,* at March Term, 1916, of EDGECOMBE.

The prisoner was charged with having murdered Easter Grimes on 2 January, 1916. There was a verdict of murder in the second degree and a sentence of twenty years in the State Prison, from which judgment the prisoner appealed.

There was a motion for judgment of nonsuit when the State rested, and again at the close of all the testimony, and the only question presented for review is raised by the exceptions to the denial of those motions.

The deceased disappeared on the first Sunday or Monday in January, 1916, and her dead body was found February, 1916, about 1 mile from

the courthouse in Tarboro, near the road leading to Rocky Mount. It was in the woods about 300 yards from the road, and had been dragged part of the way and was much decomposed; there was a hole in her head. The prisoner was arrested same evening and placed in jail, where he remained until trial. Easter Grimes lived with Della Killebrew and had been there since 1 September, 1915. Della Killebrew testified that the prisoner came to see Easter twice during that time. There was evidence by Walter White that the defendant had been seen with her several times around Tarboro, and Eliza Powell, a State's witness, testified that she saw him with her the first Sunday in January about dusk, two blocks south of courthouse. This was the last time she was seen by any State's witness. The prisoner introduced several witnesses who saw her Monday morning coming towards Tarboro by the place where she was found dead.

Fannie Killebrew, daughter of Della Killebrew, testified as to what defendant said to her on 7 January: "Doc said, 'Where is Easter?' I said, 'I don't know, Doc; do you know?' He said, 'No,' then said, 'I am just joking; I would tell you, but you would tell.' I said, 'Where is she?' He said, 'No, I ain't going to tell.' 'Did you see the shoes I bought her?' I said, 'Yes; they certainly is pretty. How much did you pay for them?' He said, 'Four dollars.' I said, 'You didn't pay $4; you paid $3.50, because I got mine for $3.50; they were on sale.' 'Don't you know I almost forsaken my wife for that woman?' He said: 'I'd suffer in hell before I let her go back to her husband. When you hear she is dead, you'll know d—n well who did it.'" She further testified: "After she disappeared, he came twice, calling for her; about two or three weeks after she disappeared; told him I did not know where she was."

Eliza Powell testified that the prisoner and the deceased were at his sister's, two blocks south of courthouse, on Albemarle Avenue, talking, and left her house on Sunday about dusk, going toward Main Street, and she said that she was going home. She further said that the prisoner told her that Easter Grimes had gone to Rocky Mount on the first Sunday in January.

Carrie Killebrew testified: "Walter White came to our house."

Rosa Hart testified that she had a conversation with the defendant, after the deceased disappeared, as follows: "He asked if I had seen Easter; I told him no, and asked if he had seen her. He said no; I said, 'I thought she was in Rocky Mount with her husband.' He said, 'She is.' I said, 'How do you know?' He said, 'No, she's not there; but I know where she is. If you knew, would you go to her?' I said, 'Yes.' He said, 'If you promise, I will carry you to see her. You be ready and I'll carry you there to see Easter.'"

Walter White testified that he had seen the defendant and deceased together several times and heard the defendant tell her that "he had bought her the shoes and whenever she wore them to Rocky Mount to see George he was going to kill her and pull them off." He further testified that at the preliminary hearing he only said, "On Saturday after Christmas I saw them in E. Saide's store; she had shoes in her hand and they were side by side; I was outside as she came out; she had a shoe box under her arm," and said nothing about any threat.

J. W. Thomas, deputy sheriff, described the body and the place where it was found, and stated that "the body was found at 4:30 and defendant was arrested right after supper; that defendant held his nerve well when arrested; always said he was not guilty; that he had taken him out of the cell and talked with him."

E. B. Hyatt testified that one shoe was found near the body, 30 or 35 feet away, after body was buried.

The above is the evidence which the State relied on to connect the defendant with the murder, and at the conclusion of the same, the prisoner moved for judgment of nonsuit, which was refused.

The defendant testified that he went with the deceased on that Sunday evening to Dora Jackson's (about 2 miles from Tarboro) and left her there; this was 1 mile beyond where the body was found; that the deceased was a woman of bad character; he offered the testimony of Dora Jackson, who testified that the deceased spent the night with her and that she left for home the next morning; and the testimony of John Leggett, Arthur Lawrence, and Alex Parker, that they saw her coming from Dora Jackson's towards Tarboro next morning; and of Wiley Andrews, that she saw her at Dora Jackson's house on Monday morning; of B. S. Price, Dossey Pittman, and Joe Dickens, that the defendant worked on Monday, Tuesday, and Wednesday after the first Sunday in January on the Knightland farm. B. S. Price also testified that the demeanor of prisoner was the same before and after January 1st, and that he made no effort to escape.

Dr. W. W. Green, coroner, testified (page 18): "Saw body; had been dead for about a month or longer; couldn't say what killed her, nor how long she had been dead."

The defendant again moved for judgment of nonsuit, which was refused.

The jury convicted the prisoner of murder in the second degree, and he appealed from the judgment upon the verdict.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*W. O. Howard for defendant.*

56—172

WALKER, J., after stating the case: There is but a single point for us to decide in this case, and that is whether there is any evidence, even a scintilla, of the prisoner's guilt. This is sometimes, and, we may say, quite often, a difficult question to answer, the difference between some evidence, though slight, and no evidence, requiring in many instances very fine discrimination. We may say with certainty that evidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it is so, is an insufficient foundation for a verdict, and should not be left to the jury. *S. v. Vinson,* 63 N. C., 335; *Brown v. Kinsey,* 81 N. C., 245; *S. v. Christmas,* 101 N. C., 749; *S. v. Costner,* 127 N. C., 566; *S. v. Lytle,* 117 N. C., 799; *S. v. Carmon,* 145 N. C., 481; *S. v. Walker,* 149 N. C., 527. We said in *Byrd v. Express Co.,* 139 N. C., 276: "Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character as that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence. *Cobb v. Fogalman,* 23 N. C., 440; *Wittkowsky v. Wasson,* 71 N. C., 451; *Sutton v. Madre,* 47 N. C., 320; *Pettiford v. Mayo,* 117 N. C., 27; *Lewis v. Steamship Co.,* 132 N. C., 904. In the last cited case the subject is fully discussed by *Connor, J.,* and the cases collected. It all comes to this, that there must be legal evidence of the fact in issue and not merely such as raises a suspicion or conjecture in regard to it. The plaintiff must do more than show the possible liability of the defendant for the injury. He must go further and offer at least some evidence which reasonably tends to prove every fact essential to his success." So it was held in *Campbell v. Everhart,* 139 N. C., 503, 516: "The sufficiency of evidence in law to go to the jury does not depend upon the doctrine of chances. However confidently one, in his own affairs, may base his judgment on mere probability as to a past event, when he assumes the burden of establishing such event as a proposition of fact and as a basis for the judgment of a court, he must adduce evidence other than a majority of chances that the fact to be proved does exist. It must be more than sufficient for a mere guess, and must be such as tends to actual proof. But the province of the jury should not be invaded in any case, and when reasonable minds, acting within the limitations prescribed by the rules of law, might reach different conclusions, the evidence must be submitted to the jury," citing authorities. It will not do, it is conceded, to convict any man of a crime upon mere conjecture, or even the strongest suspicion, if it does not rise to the dignity and certainty of legal proof which excludes all reasonable doubt of his guilt. But we are not embarrassed in this case by the necessity of resorting to nice refinement in our reasoning, or

any fine-spun distinction between what is *some* and what is *no* evidence, for the facts and circumstances here do not approach the border line separating the one from the other.

Where there is no direct proof of the commission of the criminal act by the prisoner, and we must have recourse to circumstantial evidence, it is proper to consider the motive to do the act, if he had it, as one of the links in the chain of proof. This was decided in *S. v. Adams,* 138 N. C., 688, 697, in this language: "When the evidence is circumstantial, the proof of a motive for committing the crime is relevant, and sometimes is important and very potential, as it may carry conviction to the minds of the jurors, when otherwise they would not be convinced. This is all that is meant by the Court in the cases cited by counsel. *S. v. Green,* 92 N. C., 779. Murder may be committed without any motive. It is the intention deliberately formed, after premeditation, so that it becomes a definite purpose to kill, and a consequent killing without legal provocation or excuse, that constitutes murder in the first degree. The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential element of the crime, nor is it indispensable to a conviction of the person charged with its commission." Citing *S. v. Wilcox,* 132 N. C., 1143; *S. v. Adams,* 136 N. C., 620. The prisoner had the motive to commit this crime, because he so declared himself. The deceased had been his paramour; he was infatuated with her and jealous of her husband. She had frequently been his companion and was seen with him by the neighbors. He was with her shortly before she disappeared to be seen alive no more. The evidence fairly warrants the inference that he was the last person who was with her just before her death. A few days after she was last seen on Sunday, 2 January, or Monday, 3 January, 1916, he inquired of Fannie Killebrew where Easter Grimes was, and when she replied that she did not know, and asked him if he knew, he, at first, said, "No," but immediately corrected himself and then admitted that he was joking when he said "No," and that he did know, but would not tell her, lest she might tell it to some one else. The jury might well conclude from this admission that he knew where she was, and, if so, that he knew she was then dead and where her body lay. If this be true, and he had knowledge then of her death, which was a violent one, it would not be unreasonable or unsafe to infer that he was present when she was killed. But this is not by any means all of the evidence pointing to the prisoner as her slayer. He treated this serious matter with some levity, and talked a great deal in a light vein. This may have been merely characteristic of his race, or idle and frivolous talk; but it is not inconsistent with the cold-heartedness and manifest indifference with which he had

threatened her life if she dare return to her husband at Rocky Mount. In this connection his last words to Fannie Killebrew after talking about the shoes are significant: "Don't you know, I almost forsaken my wife for that woman? I would suffer in hell before I would let her go back to her husband. When you hear she is dead, you will know damned well who did it." He had given her the shoes as his mistress, and was determined, and so warned her, that she should not attempt a return to her husband, where she belonged, except at the cost of her life. All this means that if she started back to Rocky Mount, where her husband lived, he would kill her first and then pull the shoes from her feet, and that is what was done. She was on her way back to her husband and had gone one mile or more when he executed his threat by killing her, dragging her body into the woods, and then taking her shoes off and dropping one of them near where her body lay. He knew that she had gone to Rocky Mount on the first Sunday in January, for he told Eliza Powell so, and this shows that he must either have gone with her for the one mile, or that he overtook her, after he had discovered her whereabouts, and then slew her, as she was doing what he had forbidden her to do on pain of her life. It makes little or no difference which version is the true one, whether he went with her or caught up with her on her way to her husband's home. The fact that he was with her at the time is the material and vital one. He told Rosa Hart that Easter was not in Rocky Mount, and he knew where she was. How could he know she had not reached Rocky Mount, but was killed on her way to the place, unless he was with her? He knew that she had started for her husband's home, and there is no evidence that any one else was with her or knew where she had gone. This evidence points strongly to the prisoner as her guilty companion in her last moments. But why is not his own words to Fannie Killebrew and Rosa Hart substantially a confession of his guilt or at least of his presence when and where the homicide was committed? He admitted when Easter was lying dead in the woods that he knew where she was, and he told Fannie Killebrew, "When you hear she is dead, you will know damned well who did it," and he said this because he had threatened to kill her if she went to her home with the shoes, and his neighbors knew of his threat. Therefore, it was that he said to one of them, "You will know who committed the deed when you hear of her being dead," meaning , without any doubt, that he had done it, as Easter was then dead. If she had been killed after he made these statements, the evidence would still be strong, but being dead at the time, his words amount to a present confession of his guilt, and not merely to a threat of committing the act in the future.

The prisoner, as a witness in his own behalf, denied that he had said to the State's witnesses what they testified that he did. The evidence

offered by him, except his own denial of the charge, is not necessarily inconsistent with the fact that he killed Easter Grimes. It does not account for his presence elsewhere for the whole period of time during which the homicide may have been committed, and besides it was the province of the jury to decide whether the evidence was true. It does not appear that any other person had any motive to commit the crime, or the opportunity, but, on the contrary, the combination of motive, threat, time, place, and circumstances, as detailed by the witnesses, all tend to establish the guilt of the prisoner. *Brown v. State,* 141 Ga., 5.

There was no error in overruling the motion to nonsuit and submitting the case to the jury upon the evidence.