### STATE v. WESLEY CLARK.

(Filed 21 February, 1917.)

**Arson—Trials—Evidence—Questions for Jury—Nonsuit.**

Evidence, upon a trial for arson, which tended to show that a dwelling-house was burned about 3 o'clock in the morning, and thereafter, on the same morning a frying-pan was found beneath it in which balls of cotton had been saturated with kerosene, from which the house had caught fire, some of which were found partly charred, is sufficient evidence of arson; and evidence tending to show that the prisoner had threatened the life of the occupants of the dwelling on the previous day; that he dwelt with his wife near by, and had left his room about five minutes before the fire occurred, was seen under suspicious circumstances near the place, just before the time, left home without explanation and gave no reasonable explanation thereafter, and was arrested in a neighboring State and brought back for trial, etc., is sufficient to sustain a verdict of the prisoner's guilt; and a motion as of nonsuit thereon was properly denied.

INDICTMENT for arson, tried before *Allen, J.,* and a jury, at September Term, 1916, of EDGECOMBE.

As the prisoner moved to nonsuit the State, under the statute, upon the ground that there was no evidence of his guilt, it will be necessary to set forth a part of the testimony as given by the State's witnesses, which is as follows:

Nancy Buckner testified: "I am 60 years of age; have lived in Tarboro most of my life; am a widow, my husband having been dead many years. On 21 August, 1915, I owned a lot and dwelling-house thereon, situated on corner of Water and Trade streets of the town of Tarboro; it was a one-story three-room frame house, with ell and kitchen behind, and back and front porch with fence around portion on Water Street; and porch of said house was right on Water Street, the sill of which rested on ground; the lots along here dropped to the lowgrounds of the river and the back part of the house was on posts or pillars high enough for me to walk under the same; my house fronted on Water Street and was on the south side of the same; I kept firewood beneath the back part of the same. I rented two front rooms to Florence Peyton and her grandmother, Lidia Olus, and they with Florence's child slept there at nights, but worked out during the day. There had been no fire in the house that day except in the kitchen. I knew prisoner, Wesley Clark; he and his wife were living at that time on Albemarle Avenue of the town, above the cotton yard, which is next street west from Trade. East of my house on side of Water Street was an open space about 80 feet to next house. Florence Peyton slept in room next to cotton yard. On Saturday morning, 21 August, 1915, I saw Wesley Clark in Florence's room; I ordered him out and told him not to come back there any more, and he said that I had nothing to do with his being in Florence's room and Lidia's room, their part of the house; he got mad and was quarreling, and said if he got mad something would be done; that he would belch and everybody would know it; told him not to belch in there or he might turn the house over; appeared like he was mighty mad; said if he got mad every one would know it; that he would go to the electric chair for me. I told him that I would have him put out, and he said he would slay any one who would try to put him out. I told him to get one; I was tired of hearing him run his mouth. He left. This was about 9 o'clock a. m., Saturday, 21 August, 1915. I saw Wesley again that night about 8 o'clock. He came up Trade Street from river, but did not come nearer than street and did not speak. I have not seen him since until case was tried today. He had been at my house before and I had ordered him away, but he did not listen to me. That night my house was burned up just before day; think between 3 and 4 a. m. I was in bed and Florence waked me up; ran outside and fire was on outside

of building next to cotton yard; fire was blazing up outside and was over in a few minutes. I did not go back to see if fire was on inside, there was so much smoke. Alarm given and fire company came; the house was practically destroyed by flames; had no insurance; my policy had lapsed. I was at house next morning about 10 o'clock, when Mr. McCabe and Bob Cosby came there. They found a frying-pan on sill of the house next to cotton yard and a round box like you buy toilet powder in. We did not know what was in box. The frying pan was not mine; did not smell it; no children about it; don't know how long prisoner has been here; do not know what he does; known him right along. I don't know what he said would happen. Florence Peyton and her grandmother had been living with me two years or longer; Florence was a single woman; had one child; no children born to her in my house; had had quarrels with prisoner before this, but he kept on coming to my house. Wesley brought me a watermelon that Saturday morning."

Bert Shaw testified: "I am a single woman and do washing; came home early on morning of 21 August, 1915; I think about 3 a. m. I saw Wesley Clark on the railroad in front of my house; the railroad ran along Albemarle Avenue, a street of Tarboro; electric light there and saw him distinctly. He went and sat down on steps of William Ann Avis. Came home at 3 a. m. that morning from picnic. I was in buggy with two men; did not know them; I was tired, undressed and went to bed and to sleep. My mother woke me at the sound of the alarm of fire. Don't know exactly what hour; did not get up or go to fire. William Ann Avis and the prisoner and his wife lived in the same house— double house with four rooms on Albemarle Avenue; the railroad runs down the avenue; cotton yard on railroad and in front of the house in which prisoner lived."

William Ann Avis testified: "On 21 August, 1915, I was living in a four-room house on Albemarle Avenue. I occupied two rooms of the house and Wesley Clark and his wife occupied the other two. There was a lathed and plastered partition between us. I could hear them talk from my rooms and they could hear me. I remember I was sick on the night that Nancy Buckner's house was burned and was up most of the night. About 3 a. m. I heard Wesley Clark leave his house and about five minutes thereafter the fire alarm bell was rung. I called Wesley's wife, and when she came out she was fastening her dress. We went to the fire to Nancy Buckner's house; Wesley was not there, I did not see him and have not seen him since. I have one bastard child now, grown and married. I have no ill or bad feeling against Wesley Clark; the cotton yard was south of my house; cotton yard was open and ground path ran across same to Water Street; I heard the fire alarm bell five

minutes after Wesley went out of room. I have been sentenced to the county home for sixty days for cutting my husband, and served my time."

Florence Peyton testified: "I am 21 years old; work at washing and ironing; I was born in New York; lived a while at Chapel Hill; have been here some time. I have had rooms with my grandmother, Lidia Olus, for two years or more at Nancy Buckner's house. Worked out and slept there. I had no fire in or about my room 21 August; there may have been a can of kerosene in my room. About 9 a. m. that day I was asleep in my room and Wesley Clark woke me up. I asked him what he was doing in my room and I in my night clothes; he said, 'Can't I talk to you? I have treated you too much like a lady to talk about me to my back to that man at the spring.' I told him I had not talked about him to any man anywhere. He quarreled some. He pulled out his knife and drew it across my throat. I told him to cut my throat, and he said he did have a great mind to do it. He then went out of my room, and Nancy Buckner asked him what he was doing there. He replied that it was none of her business; that he was tired of fooling with Tarboro negroes, and that he was going to belch and everybody in Tarboro would know it. He said that he would go to the electric chair for Nancy. Nancy told him to get out and he told her she could not put him out. She said she would send uptown and have him put out. He said he would cut any one sent in cracks. He said he is all right. 'I have treated you too nice and bad luck will follow your tracks.' He told me, 'You treat me wrong,' and that I would soon fall in hell. Wesley left after that, and I have not seen him since until the trial. Wesley was never in my room before. There was nothing improper between us. He had never given me any money. I was never afraid of his cutting my throat. He has visited at Nancys' before. The New Year before she had him to come through the hall said it would give her good luck. I had no insurance. When I waked up that night my room was full of smoke; saw flames in wall. I aroused Nancy; went out and fire was outside of house; my room was on the corner next to the cotton yard. The house was burned in a few minutes. There was so much smoke that I could not get back in the house to save anything. The fire occurred just before day; believe between 3 and 4 a. m. Fire company came after the alarm."

Lidia Olus testified: "I am the grandmother of Florence Peyton and at the time of the fire had rooms with her at Nancy Buckner's; was cooking for Mr. Savage. About 10 o'clock Saturday morning, 21 August, 1915, Wesley Clark came by where I was working and said: 'Old Buck is mad with me; told me to get out of her house.' He said she was a mean negro. I told him not to pay any attention to that. He

did not seem mad. I had lived at Nancy Buckner's two years or more, and Wesley Clark frequently visited the house. I worked out as a cook and stayed at Nancy's at night."

Paul McCabe testified: "I am a member of Tarboro Fire Company and make reports to Raleigh. I was at fire at Nancy Buckner's Sunday morning, 22 August, 1915. I was back there at 10 a. m. with Bob Cosby and L. E. Fountain. I found frying-pan on sill next to Trade Street and also some burnt cotton under the house. The pan was about 10 inches in diameter and 2 inches deep and would hold two quarts. I smelled oil on the same and saw partly burnt bunches of cotton; the cotton appeared to be in balls or as if same had been compressed slightly. There was a train that passed Tarboro for Norfolk, Virginia, at 4 a. m., at this time. The cotton yard was about a half block away on north side of Water Street, northwest from Nancy's house. Behind Nancy's house and along Water Street the land sloped sharply to river low-grounds, and they are overflowed at high water. Wind might blow cotton from cotton yard to back lots. Fire would burn up kerosene oil, but what I meant to say was that I smelt the odor of burnt oil." (There was other testimony to the effect that cotton could be blown to place where fire started.)

Bob Cosby testified: "I was present on Sunday a. m. after fire at Nancy Buckner's house with Paul McCabe and L. E. Fountain. Saw the frying-pan as described by Mr. McCabe and saw where it was. It was where McCabe said it was. It had the appearance of being a new one and had never been used before; smelt of burnt oil. There was a train that passed Tarboro going to Norfolk via Hobgood about 4 o'clock in the morning."

P. F. Pulley testified: "I am chief of police of Tarboro, and at request of Sheriff Hyatt I went last March to Norfolk for Wesley Clark. I knew him and I found him in jail. I spoke to him. At first he did not speak, but later did. The only thing he said to me coming from Norfolk to Tarboro, on the railroad cars, was that as the train was near or approaching Hobgood, Wesley looked out of the window and remarked that 'Right along here is where I was at sunrise on the Sunday morning that I am charged with burning Nancy Buckner's house.'"

There was testimony that the prisoner had worked for Harry Anthony in Halifax County and that he walked to Anthony's home from Tarboro the morning on which the fire occurred, arriving there about 10 o'clock a. m. and a day before he was expected. He worked for Anthony for several months and was engaged in ditching. He gave as his

reason for coming a day ahead that "he wanted to be on the job in time"; that he had money and could have come by train, but be preferred to walk. He arrived on Sunday.

The prisoner moved for a nonsuit, the motion was denied, and he excepted. There were other rulings to which he took exceptions, but they will be noticed hereafter. He was convicted by the jury and appealed from the sentence of the court.

*Attorney-General Manning and Assistant Attorney-General Sykes for State.*

*James M. Norfleet for defendant.*

WALKER, J. It will be necessary to consider only one question, as the others are, in our opinion, without substantial merit. The prisoner, at the proper time, moved for a judgment of nonsuit upon the evidence, which the court refused to grant, and properly so, as there were facts and circumstances which tended to show his guilt. The crime of arson is one usually committed with great secrecy and not infrequently under the cover and concealment of night. The State, therefore, in most of the cases is compelled to rely on circumstantial evidence for a conviction.

The undisputed facts in this case tend very strongly, though not unerringly, to implicate the prisoner as the guilty party. He had made threats against the owner of the house, Nancy Buckner, the day before the burning, which clearly implied that he would take the earliest opportunity to avenge what she had said and done to him. It is true that the threats were general in their character and did not indicate that his purpose was to burn her house, but they were at least sufficient to show that he had a motive for the act. That the burning was the act of an incendiary appears from the manner in which it was done. The cotton was no doubt taken from the adjoining yard, where cotton was to be found, and saturated with oil or kerosene, which would soon start a fire, and this fact accounts for the short interval of time after the prisoner left his house and the fire alarm. The facts that he arose before day, at 3 o'clock in the morning, when there was no good reason for his doing so, and was seen by Bert Shaw on the railroad near the house at that early hour, under suspicious circumstances, and that he was not at the fire, but immediately after it was started he left afoot for another county, without apparently telling his wife or any one else where he was going, and that he stayed away and out of reach of the officers for many months, and was finally found in jail at Norfolk, where he was captured—these and other circumstances, while they may not produce absolute certainty of his guilt, are yet sufficient for the consideration of the jury. We said in *S. v. Bridgers,* 172 N. C., 879, in a

similar case: "It does not appear that any other person had a motive to commit the crime, or the opportunity, but, on the contrary, the combination of motive, threat, time, place, and circumstance, as detailed by the witnesses, all tend to establish the guilt of the prisoner," citing *Brown v. State,* 11 Ga., 5 (80 S. E., 320). See, also, *S. v. King,* 162 N. C., 580; *S. v. Barrett,* 151 N. C., 665; *S. v. Thompson,* 97 N. C., 496; *S. v. Gailor,* 71 N. C., 88.

The facts in this case are not substantially weaker than those in *S. v. King, supra,* and *S. v. Goings,* 101 N. C., 706, where convictions were sustained. Here we have the presence of the prisoner at a place very near the house that was burned, at an unusual hour; the occurrence of the fire almost immediately he was seen; his sudden departure from his home when the alarm of fire was given; his absence for many months, and, finally, the motive to commit the incendiary act.

We are mindful of the rule that evidence which merely shows it possible for the fact in issue to be alleged, or which raises only a conjecture that it is so, is an insufficient foundation for a verdict of guilty, and should not be left to the jury (*Byrd v. Express Co.,* 139 N. C., 276; *S. v. Vinson,* 63 N. C., 335); but this evidence is of stronger probative force than conjecture and furnishes a much more substantial basis for a conviction. It was for the jury to pass upon its weight, and they could reasonably infer the prisoner's guilt therefrom. *S. v. Lytle,* 117 N. C., 803; *S. v. Carmon,* 145 N. C., 481; *S. v. Adams,* 138 N. C., 688; *S. v. Walker,* 149 N. C., 527; *S. v. McGlammery, post,* 748. These cases, and those already cited, fully sustain the ruling of the court. The evidence in this case is really stronger against the prisoner than it was in some of the cases we rely on, where convictions were sustained.

The prisoner's explanation of his sudden departure from Tarboro for Halifax County at 3 o'clock in the morning was not a very creditable one. He could have left much later in the day and reached the home of the witness Harry Anthony earlier in the afternoon of Sunday, the day before Anthony says he was expected by him. After making his threats, it was a singular coincidence that the prisoner should have left Tarboro at the very moment when the fire broke out. But it is not this fact, nor the motive or the threats or any other single circumstance, taken singly or by itself, that tends to prove his guilt, but all of the facts, considered as a whole, and in relation to each other, which warranted the jury in deciding the issue against him. There was no reversible error in the other rulings.

No error.