## STATE v. JIM BALLARD.

(Filed 27 January, 1926.)

**1. Homicide—Malice—Evidence—Scienter—Murder in the First Degree.**

Where the evidence on the trial of a homicide that the prisoner, knowing the deceased, an officer of the law, had come to arrest him, got a shot gun and went up the stairs to the second story of the house, loaded the gun and shot and killed the deceased through a hole in the floor, evidence that the prisoner on the preceding night personally threatened to "get" the deceased, etc., is competent as tending to show premeditated malice on the part of the prisoner towards the deceased, and objection that the witness had not heard the whole conversation is untenable.

**2. Trials — Improper Remarks of Counsel — Instructions — Appeal and Error—Prejudice—Harmless Error—Homicide.**

It would be prejudicial error to permit uncorrected a characterization by a prosecuting attorney in his speech to the jury of the prisoner on trial for a homicide as a "human hyena," but where the trial judge immediately stops him and at that time and later in his charge strongly emphasizes the impropriety of the remark, and tells the jury that the prisoner is entitled to a fair and impartial trial under the evidence, a new trial will not be granted on appeal.

APPEAL by defendant from *Grady, J.,* at June Special Term, 1925, of GATES.

Criminal prosecution tried upon an indictment charging the defendant with the murder of Vernon Eason.

On 5 May, 1925, about 9:30 or 10:00 p. m., Vernon Eason, a deputy sheriff of Gates County, together with two assistant officers, his brother, Millard Eason, and S. A. Jenkins, went to the home of the defendant, Jim Ballard, who lives about four miles from Gatesville, to arrest him on a warrant charging him with resisting an officer. As the officers approached the defendant's house, they separated, Millard Eason and Jenkins going to the rear of the house and Vernon Eason to the front. The house is a two-story dwelling with an 8-foot hall and stairway. Vernon Eason walked up to the door, knocked and called the defendant. He made no answer, but the other officers saw the defendant, who was sitting with his wife in their bedroom, get up, go to the bureau in his room and from the bureau to the bed, turn back the mattress, and then go out into the hall and start up the stairs. Just at this time, Cora Ballard, wife of the defendant, opened the front door and Vernon Eason said to the defendant: "Don't go up stairs, I have papers for you." The defendant had a gun in his hand and proceeded to the second floor of the house. Sally Mary Ballard, who was on the second floor, came running down the steps, and looking back at Jim Ballard, said, "Don't shoot

me." Vernon Eason went into the house and was standing at the foot of the stairs when he called to the defendant, who was then at the top of the stairway with a shotgun in his hands, to "come down I have papers for you." The other officers came into the hallway and were standing near Vernon Eason when Sally Mary Ballard got a lamp and held it so it would shine on Vernon Eason's face. Immediately the defendant from upstairs poked his gun through the flooring, shot Vernon Eason in the face and chest, killing him almost instantly.

Consternation then reigned for some time, several shots being exchanged between the officers and the inmates of the house, Cora Ballard joining in the shooting. The two officers dragged the body of the deceased about thirty steps from the house, left it and went to a nearby house to call for help from Gatesville. They left the deceased lying on his left side; when they returned in a very short time, he was lying on his back, with his arms folded, his head bruised and his skull knocked in. It was a bright, moonlight night.

The defendant, testifying in his own behalf, said that he did not load his gun until he got upstairs, as he had his shells in his hand on the way up; that the deceased told him he would shoot him if he went upstairs; and that he did not shoot until after the officer had shot at him. The defendant fired the first shot according to the State's evidence. He knew that the deceased was an officer and had a warrant for his arrest.

At the close of the evidence, defendant's counsel suggested that the prisoner was guilty of murder in the second degree, at least, and requested the court to submit the case to the jury solely upon the question as to whether there was sufficient premeditation and deliberation to constitute murder in the first degree.

The State contended that the prisoner deliberately armed himself with a gun and shot the deceased in cold blood, with malice aforethought and with premeditation and deliberation.

The jury found the prisoner guilty of murder in the first degree, and from the statutory sentence of death pronounced thereon, this appeal is prosecuted.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*
*Bridger & Eley for defendant.*

STACY, C. J., after stating the case: There was ample evidence offered on the hearing to warrant the jury in returning a verdict against the prisoner, as it did, of murder in the first degree. *S. v. Benson,* 183 N. C., 795. And from a careful examination of the entire record, we are of opinion that appellant has no just grounds for complaint. His

exceptions must all be resolved in favor of the validity of the trial. There are only two which merit any discussion.

The first exception is addressed to the admission of certain evidence tending to show malice on the part of the prisoner towards the deceased. Herbert Raby was allowed to testify, over objection, that he went out with Vernon Eason to Noah Ballard's house on the night before the killing. Jim Ballard was there and in talking to Vernon Eason, the witness heard him say: "You are white and I am black. You are nothing but a meat man, just like me. It is no more for you to die than it is for me." And he added: "I'll get you." There was some argument between the officer and the defendant, but the witness did not hear it all.

It is contended on behalf of the prisoner that this evidence was incompetent and should have been excluded, because the witness did not hear all that was said by the officer and the defendant, and for the further reason that there is nothing to connect it with the homicide. The exception is without merit. The evidence is clearly competent as tending to show malice on the part of the prisoner towards the deceased. It contains a threat against the deceased. *S. v. Merrick,* 172 N. C., p. 873.

In *S. v. Norton,* 82 N. C., 629, it was said that in a prosecution for assault and battery, where the intent with which the act was done was not an essential element of the offense, declarations of the defendant, threatening the prosecutor, made two weeks prior to the assault, were inadmissible, because they in no way helped to explain or elucidate the transaction under investigation. But in writing the opinion in that case, *Ashe, J.,* took occasion to observe: "If the defendant had been indicted for murder, for an assault with intent to kill, for a conspiracy or forgery, or any other offense where the *scienter* or the *quo animo* constitutes a necessary part of the crime charged, such acts and declarations of the prisoner as tend to prove such knowledge or intent are admissible, notwithstanding they may in law constitute a distinct crime. *Dunn v. State,* 2 Ark., 229; *Thorp v. State,* 15 Ala., 749."

And in *S. v. Exum,* 138 N. C., 605, where the defendant was charged with murder, a prosecution similar to the one at bar, it was held that evidence tending to show previous threats on the part of the prisoner against the deceased, was "undoubtedly competent." To like effect are the decisions in *S. v. Wilson,* 158 N. C., 599, *S. v. McKay,* 150 N. C., 813, *S. v. Stratford,* 149 N. C., 483, *S. v. Rose,* 129 N. C., 575, *S. v. Hunt,* 128 N. C., 589, *S. v. Moore,* 104 N. C., 743, and many others too numerous to be cited.

The prisoner's second exception is addressed to certain remarks of one of the counsel for the State, who, in arguing the case before the jury, referred to the prisoner as a human hyena, and used language in substance as follows: "Remember, gentlemen, you are trying the defendant

for his life, for taking the life of one of your county's young men, a brave and fearless officer of the law, a man of high character and standing, who has been brutally murdered by the defendant who sits over there. He is a human hyena and should be treated as such."

The prisoner objected, and the court at once corrected the counsel who was speaking and directed that the statement be stricken out. Counsel apologized and then proceeded with his argument. His Honor, also, added the following caution when he came to charge the jury: "The fact that Jim Ballard is a negro hasn't anything to do with the case. He has as much right to a fair trial as you would have if you were charged with a like felony. He has the same right to have you consider his evidence and to give him each and every advantage you would give to a white man; and if you do not do it this trial will be a mere mockery, nothing more or less."

The characterization of the prisoner as a human hyena was, of course, improper, but the court was swift to interfere in his behalf. Not only did he stop counsel at the time, but he also endeavored to remove any baneful effects from the minds of the jurors when he came to deliver his charge. We think he did all that the law requires. See *S. v. Tucker,* 190 N. C., 708, where the subject was fully discussed at the present term.

After a careful and searching examination of the record, we are unable to discover any action or ruling of the trial court which was prejudicial to the prisoner. The verdict and judgment must be upheld.

No error.