The defendant was convicted of the murder in the first degree of James Miller, whom he was charged with shooting on the night of 6 August, and died on 7 August, 1933. He was sentenced to be electrocuted. *Page 376 
The judgment of death by the court below concludes with these words: "And it is considered, adjudged and ordered that the said warden then and there cause a current of electricity of sufficient intensity and voltage to cause death, to pass in and through your body until you are dead; and may the Great God, who notes even the sparrow's fall, in his infinite pity, have mercy on your soul."
The evidence, in part, by the witnesses for the State, is as follows: James L. Welch: "This was on 6 August, Sunday night, just after dark. I don't recall for sure who was there at the time of the shooting; Alvin Parker and three or four was sitting around but I can't remember who it was, but anyway the night of the shooting Bud (James) Miller came in the store and bought some cigars from me and he said that Mr. Pipes was out in the car. As soon as I got the cigars I turned around and we walked to Pipes' car, which was parked toward Rickman's steps that goes to the house, about four to six feet from the northwest corner of Rickman's corner toward the gas tank. I could not tell from where he had come. Miller and myself stood outside the car and talked to Mr. Pipes in the car some few minutes and Mr. Pipes said — Miller turned around to go in the store to get some matches and when he turned, to go back I turned around just behind him, following him. Prior to that, I had seen James Sheffield in front of Cogburn's store about 15 or 20 minutes before that. As Miller turned around to go back in the store, he was something like six to eight feet ahead of me and I followed him back in and as he stepped on the concrete under Rickman's shed at the left window as you go in, it looked like he jumped up about that high (indicating) and as he done that he turned his face back to me and he hollered `Oh, Lord, Oh, Lord, I am shot, I am killed,' and he fell like you had picked him up and throwed him down, and I walked up to him and I said, `You know you are not shot,' and he said. . . ." By the court: "How long was it after you heard the shot fire until you got to him? Answer: Two or three seconds.
"And I said, `You know you are not shot,' and he said, `Yes, I am killed,' and I squatted down over him on the balls of my feet, and Alvin Parker walked up behind me and said, `He is not shot, is he?' The shooting continued after that until six shots were fired. I squatted down over Miller and put this finger on the hole and I noticed the blood, and Parker said, `He ain't shot, is he?' And I said, `I will be damned if he ain't,' and right then I was hit in the jaw and it knocked me over and I caught on Miller with that hand, and as I raised up, one bullet cut me across there (indicating shoulder), that just scraped the hide and I got up and I kept facing where the shooting was coming from; I got up and started to back up, was backing up around the corner of Rickman's store, and I saw the fire come out of the Sheffield Garage, and I backed *Page 377 
up around the corner of the building and I saw the man as I backed around and he, Sheffield, was in between his candy car, parked on the left side of that double door, and he was in on the right side of it, and I backed around this building and I put my hands up on the building and I looked back around at him and he shot the last shot at me and I was looking at him and he knowed it. I saw him. Six shots were fired in all. I was hit twice. Q. Did you see him any more after the shooting? Answer: No, but while I was around there, I had backed around the building, and Jud Pipes kept wanting to know what was going on, or what was happening." By the court: "Did he ask you that while the shooting was going on? Answer: Yes, sir.
"I backed around the building and Mr. Pipes was turned like he was trying to get out of his car and I said, `Jud, don't get out, it is Jim Sheffield over in that garage shooting at me and he might shoot you,' and just after the shooting, I said to Mr. Pipes, he had got out of the car, and I said, `Miller is bad hurt and we will have to get him to town, and if I don't get to a doctor, I will bleed to death.' I was wounded here and it come out here (indicating on right jaw where the bullet entered, and the left jaw where it came out). Q. Come down and tell the jury where you were hit and how many teeth were knocked out? Answer: (Witness shows jury.) Here on the right side, it went in and come out here and it bursted the jaw bone and they took out some pieces at the hospital. I don't know how many teeth it knocked out. Q. State whether or not you and Jim Sheffield had ever had any trouble prior to this time? Answer: Yes, we had. Q. About how long before this, Mr. Welch? Answer: We hadn't had any trouble in some time; it has been nearly three years ago, the last words we had. Q. Tell just what happened on that occasion? Q. What did James Sheffield try to do to you, if anything, and what he did?"
The witness gave in detail, the trouble he had with Sheffield 3 years before: "James Sheffield and I have not talked any and have had nothing to do with each other since that time. . . . When I backed around the corner, I saw where the fire was coming from when the fourth shot was fired, and saw the man when the fifth shot was fired. I saw the fire from the fourth shot and backed around the corner of the building; as I backed around the corner of the building, before I got around it, is when the fifth shot was fired and when the sixth shot was fired, I was standing there looking around the corner. I wasn't sure who it was until the last shot, but I saw Jim Sheffield when the fifth shot was fired. Six shots were fired and he fired one shot after I recognized him. When the sixth shot was fired, his candy truck was parked on the left side of the door and there was a space there and he was on the right side of that candy wagon, on the right side of the car. I can't say how far he *Page 378 
was standing from the front door, he come up into the light. I can't tell you how far back in the building he was; he was somewhere about five or six feet of the front. There were no lights in the building, nothing except the reflection from Rickman's store. The first lights of Rickman's store would be about sixty or seventy feet away. There was 160 watt electric light globe in front of Rickman's store. I recognized him six feet back in the garage; I can't say that is as far out as he come. . . . After the shooting, I said I would have to get Miller to a doctor, and I said I was going to have to get to one or I was going to bleed to death. I came to Waynesville in the same car with Miller. Hugh Cathey was driving and John Michael and Turner Vance was in the back seat with Miller. I told the jury I made some statement to Jud Pipes. He said, `What is going on, what does that shooting mean?' as I backed up around the building and I heard him trying to get out of his car and I said, `Jud, don't get out, it is Jim Sheffield over in that garage and it is me he is after, and he might shoot you.' At that time I was awful mad at Jim Sheffield, about as mad as a man could be."
Kenneth Lowe: "I am the son of the sheriff and was over at Silver Bluff that night. I went in the garage as described by Mr. Welch and found some cartridge hulls. That looks like the same ones I found. I found them on the floor of the garage about six or eight feet from the door, on the right side of the candy car as you went in. I only noticed one car in the garage. These are calibre 25-20. The candy wagon was in this garage when I went over there."
Jud Pipes: "I know Jim Sheffield, James Welch and knew James Miller, the deceased. I remember this Sunday evening. I was with James Miller, who is known as Bud Miller. He come to Waynesville with me and then went back out with me. We reached Rickman's store about good dark, the best I remember, and stopped there. Miller got out to get some cigars and went in the store and got them and come back and gave them to me and he went back to get some matches; he asked me if I had any matches and he had started back to the store to get the matches. Jim Welch was with him.
"Bud was in front when they started back, and about the time he got under the shed I heard a shot fire and in a second or two Bud hollered and said he was shot; he said he was shot and killed. When I got up to where I could see out, Welch was stooping down over Miller, I was sitting with my back to them practically, and there was another shot or two fired and Jim Welch come back out like he was backing out around the corner of the building. I asked Jim Welch what was going on and what that shooting meant, and I started to get out of the car and he told me not to get out; he said it was Jim Sheffield over in the garage shooting at him and I might get shot. After the shooting was over, *Page 379 
I got out of the car and was helping carry Miller over to put him in the car to take him to the hospital and there was another gun fired after we got across the road. I wasn't in position to see where the shots were coming from because I was setting with my back toward them. I thought there were six shots fired, and I thought it was coming from across the road, that is the way it sounded."
Alvin Parker: "I was present at the Rickman store the night James Miller was shot and lost his life. I had been there about thirty minutes before the shooting occurred and saw Jim Sheffield there, saw him drive his candy truck in the garage. That was about twenty minutes before the shooting, but not more than fifteen minutes before the shooting I saw him standing in front of the garage talking to some fellows. I was under the shed at Rickman's store when the shooting took place. I was standing there and a shot fired. James Miller was walking toward the door of Rickman's store and I was facing him. Jim Welch was right by the side of him or a step or two behind him. When the first shot fired, Miller sort of wheeled around and hollered, `I am shot, I am killed,' and he fell with his back to the ground, and Jim Welch and me walked up about the same time to Miller and Jim Welch made the statement to Miller, `Bud, you are not shot,' and I said, `I don't believe he is shot' and Jim Welch stooped down and felt of the place where he was shot and he said, `Yes, he is shot,' and he said `Let's pick him up,' and we reached down to pick him up and the second shot fired and hit Jim Welch in the face and he said, `Run, I am shot,' and I ran in Rickman's store and I looked back and Jim Welch was backing up around the corner of the building. Six shots were fired. . . . I guess it is about 75 feet from this garage to where Miller was shot. The lights were burning. . . . I live near Sheffield's store. I saw this Winchester rifle, this 25-20, three weeks before the shooting. It was on Friday. I saw it in the garage, saw Leonard shooting fish with it. I didn't have the gun in my hands. I saw him load it; it was a repeater, a 25-20."
James Cogburn: "I was in the garage before this shooting; James Sheffield was in there. I had a conversation with him that night; noticed him drive his candy truck in the garage and just in a minute or so, some time, I stepped in the garage and asked him if there was anything I could help him do and he said he was waiting on his son, Leonard, to come and change his tires for him. That was some little time before the shooting, that was when he drove his car in, it was getting good dusky dark. Q. Did he (Leonard) ever come to help fix the car before the shooting? Answer: No, sir."
Dr. J. F. Abel: "That shot killed James Miller. I took the bullet out. The bullet you hand me is the bullet I took out of the body of James *Page 380 
Miller; it appears to me to be a 25-20 calibre. . . . I talked to James Welch, he said Jim Sheffield shot him."
John Mitchell: "I have borrowed a 25-20 Winchester rifle from James Sheffield, and had it at my home almost a year before that; it was on the following October, I had last seen the gun in Mr. Sheffield's garage, about three or four weeks before the shooting. It was in the garage that has been described here. The shells you hand me, which have been introduced in evidence, are 25-20 shells. That is the kind of shells the gun I saw in the garage shoots. I was inside of Rickman's store at the time of the shooting. I did not see James Sheffield there that evening; didn't see him at all. This gun was returned in October before that, almost a year before; I am not sure whether I brought the gun back or whether Leonard came after it. I heard five or six shots that night. I was inside of Rickman's store when the shooting took place. The shooting was coming from across the road, that is where the sound come from as near as I could tell; that is in the direction of the garage. The gun will shoot about eight times with a full magazine."
Turner Vance: "It was Sunday night. I was sitting on the right side of the door of Rickman's store as you go in at the front, we were all sitting there and the first thing we knowed a gun fired and Bud Miller jumped up and hollered that he was shot and he fell back toward Jim Welch, and Jim stooped over to pick Bud up and the Parker boy said, `He is not shot, is he?' and Jim said, `Yes, he is, he is shot right here,' and about that time another shot fired and that is when Welch was shot in the jaw, and by that time, they began to scatter and I went in the store and as I went in the store, Welch began to back out and I never come out of the store any more until the last shot was fired. It sounded like the shots were coming from the garage across the road. Five or six shots were fired. The last time I saw Jim Welch when I started in the store, he straightened up and started backing up in front of Rickman's store. I have seen the bullet holes there since. When Miller was hit, he fell about the edge of the window in front of Rickman's store. . . . I had seen Jim Sheffield there prior to the shooting, saw him about Cogburn's or the garage about fifteen or twenty minutes before the shooting. The garage doors were open and he was standing in front. The lights had not been on long when this shooting took place."
Deaver Gaddis: "I know James Sheffield and saw him there that night, between five and fifteen minutes before the shooting. He was at his garage door talking to Dr. Hair. He went into the garage door as I came across the road. Dr. Hair was getting ready to leave. Dr. Hair left before the shooting. That was five to fifteen minutes before the shooting. The shooting came from the garage. Five or six shots were fired. I helped put Miller in the car." *Page 381 
Theodore Hartgrove: "I know James Welch. I saw him the next morning after he was shot. He told me he knew who shot him. He said, `I know who shot me.' Sometime after that, I don't remember whether he was out of the hospital or not, I was there about three times while he was in the hospital, and one time after that he said, `Jim Sheffield shot me, I saw him.'"
E. B. Rickman: "I own the store where James Miller lost his life. I was at home on Sunday night, 6 August. I have lived at that place about five years. . . . I saw Jim Welch. When I raised the window, he was standing at the corner of the building. That was in the direction of where I thought this bullet hit the steps. I looked to see if it had hit the steps, and it had. I saw Jim Welch standing at the corner of the building. As I come out, I started over to my car, and I asked the question: `Where is this shooting from and who is it?' and Jim Welch walked up next to me and he said, `It is that damned Jim Sheffield over in the garage.'"
The defendant denied that he shot the deceased James Miller and set up an alibi. On cross-examination, he gave his version of the trouble that he had, in detail, with Welch 3 years previous. Evidence was introduced by defendant contradicting Welch and favorable to defendant. Both Welch and Sheffield's general reputation were proved to be good, by numerous witnesses.
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and other necessary facts will be set forth in the opinion.
On the record, there is no question made by the defendant as to the sufficiency of the evidence to be submitted to the jury. The facts are exclusively in the province of the jury to determine. In the exceptions and assignments of error made by the defendant, we can see in law, no error, but will consider the material ones and the law applicable. The first contention of defendant: Should the court have permitted an injured by-stander to exhibit his injuries before the jury? This question we do not think is borne out by the State's evidence. When Miller started to go into the store, he was followed by Welch and after Miller was shot down and Welch had squatted down to give him aid, he was shot in the jaw and knocked over and as he raised up, a bullet cut across his shoulder and scraped his hide, and as he backed *Page 382 
up around the corner of Rickman's store, the defendant Sheffield, kept firing at him — "he shot the last shot at me" — six shots were fired in all. The evidence clearly indicated that it was Welch that Sheffield was trying to kill and not Miller. The testimony of Welch was to the effect that the trouble between them had started three years before and the feeling continued down with the shooting. The question and answer objected to was as follows: "Q. Come down and tell the jury where you were hit and how many teeth were knocked out? Answer: (Witness shows jury.) Here on the right side, it went in and come out here and it bursted the jaw bone and they took out some pieces at the hospital. I don't know how many teeth it knocked out."
Welch testified from where Sheffield fired the shots. It was competent for the State to show the range of the bullet, this would tend to corroborate Welch as to where Sheffield was standing when he fired. We cannot see how it would be prejudicial or unnecessarily arouse the feeling of the jury. They could see the witness on the stand and could see the injuries better when closer to the jury. The ill will of Sheffield in this case was towards Welch not the dead man. The range of his rifle indicated that it might have been for Welch on the first shot, as he was close to Miller, but the other five shots — two hit and the others followed Welch as he backed away. The evidence indicated that Sheffield had malice towards Welch and killed Miller when shooting at Welch.
In Whartons' Criminal Law, 12th ed., Vol. 1, part sec. 442, pp. 677678, we find: "Where A. aims at B. with malicious intent to kill B., but by the same blow unintentionally strikes and kills C., this has been held by authorities of the highest rank to be murder." S. v. Benton, 19 N.C. 196;S. v. Fulkerson, 61 N.C. 233; S. v. Cole, 132 N.C. 1069.
The law is thus stated where numerous authorities are cited, in S. v.Dalton, 178 N.C. 779 (781): "In cases of this character, it is the generally accepted principle that, where one man, engaged in an affray or difficulty with another, unintentionally kills a bystander, his act shall be interpreted in reference to his intent and conduct towards his adversary, and criminal liability for the homicide, or otherwise, and the degree of it must be thereby determined." On this aspect, the court below charged the jury, which was not excepted to, as follows: "I also charge you, gentlemen, that it is the law of this State that if one, attempting to commit a premeditated and deliberate murder, shall, while in the act, and as a result of it, kill another, he will in respect to the person killed be guilty of murder in the first degree; as if one lay poison for A. and it is taken by B., from which he dies, it is murder in the first degree; or if one, of malice, either express or implied, but without premeditation, and without deliberation, be in the act of killing A., and while in the act and as a result thereof, he kills B., it is murder in the second degree." *Page 383 
The second contention of defendant: Did the court err in admitting evidence of ill will between the prisoner and a witness, and the details of a former controversy between them? This contention we do not think is borne out by the State's evidence. The shots indicated defendant was trying to kill Welch, the witness, and not the one he killed. It is well settled in this jurisdiction that: Motive is not an essential element of murder in the first degree, nor is it indispensable to a conviction even in cases of circumstantial evidence, though it may tend to show the degree of the offense, or to establish the identity of the defendant as the slayer. S. v.Adams, 138 N.C. 688 (697); S. v. Lawrence, 196 N.C. 562 (565).
In S. v. Merrick, 172 N.C. 870 (873-4), we find: "In S. v. Norton,82 N.C. 629, it is held that in an assault and battery evidence of previous declarations of the defendant tending to show malice is incompetent, but `If the defendant had been indicted for murder, for an assault with intent to kill, for a conspiracy or forgery, or any other offense where thescienter or the quo animo constitutes a necessary part of the crime charged, such acts and declarations of the prisoner as tend to prove such knowledge or intent are admissible, notwithstanding they may in law constitute a distinct crime.' The declarations here made, especially in view of the immediate facts surrounding the homicide, probably had exceedingly small if any weight with the jury. But the fact that it may have been made 6 or even 12 months previously did not make such evidence incompetent as a matter for them to consider as to the weight to be given the evidence. In S. v. Exum, 138 N.C. 599, declarations showing ill will made several months previously were held by Hoke, J., `undoubtedly competent.' To same purport, S. v. Rose, 129 N.C. 575, and other cases. Indeed, if previous threats are competent, the prisoner cannot complain of the competency of evidence less effective to show animus." S. v. Ballard,191 N.C. 122. The testimony of Welch was to the effect that the ill will from the trouble, continued down to the shooting.
The version of the trouble between the two men three years before, was testified to by both Welch and Sheffield. The jury heard both sides, we do not think the admission to show malice was prejudicial.
The third contention of defendant: Did the court commit error in allowing evidence to be introduced as to the conduct of the son of the prisoner? From a perusal of this evidence, we do not think it merits the view taken by defendant. The defendant set up an alibi that he and Leonard Sheffield, his son, at the time of the shooting, were at his home in bed. The testimony objected to was to the effect that Leonard never came to fix the car before the shooting and was seen 3 to 5 minutes after the first shot in the vicinity. This was admitted by the court below *Page 384 
solely for the purpose of contradicting the defendant Sheffield, if the jury so found that it did.
The fourth contention of defendant: Did the court commit error in its charge to the jury as shown by the various assignments? We think, taking the charge as a whole, it was not prejudicial, but carefully gave the contentions of the State and defendant and the law applicable to the facts. The charge in reference to burden of proof applicable to civil cases, was immaterial and harmless. The law applicable to murder in the first degree and the duty of the State to establish same beyond a reasonable doubt, was clearly set forth. What was wilful, deliberation, premeditation and reasonable doubt was properly defined. The law of murder in the second degree and malice was accurately defined, also manslaughter. The law in regard to substantive evidence explained and corroborative and contradictory evidence applicable to certain witnesses was especially called to the attention of the jury. The law of circumstantial evidence, was fully set forth. The court below charged the jury: "But motive is not an essential element of murder in the first degree, nor is it indispensable to a conviction, even though the evidence is circumstantial. It is the intention deliberately formed after premeditation, so that it becomes a definite purpose to kill, and a consequent killing, without legal provocation or excuse, that constitutes murder in the first degree. (S) The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the prisoner, as the slayer. (T) But motive is not an essential element of the crime, nor is it indispensable to a conviction of the person charged with its commission. Gentlemen of the jury, as I have already indicated, the prisoner says he wasn't there at the time, that he was at home asleep and knew nothing about the shooting nor about Mr. Welch having been shot nor about Mr. Miller having been fatally shot until an hour or so afterwards. (U) In other words, the prisoner relies in part on what is known in law as alibi. An alibi, meaning elsewhere, is not, properly speaking, a defense within any accurate meaning of the word `defense' but is a mere fact which may be used to call in question the identity of the person charged, or the entire basis of the prosecution. (V) The burden of proving an alibi, however, does not rest upon the prisoner. The burden of proof never rests upon the accused to show his innocence, or to disprove the facts necessary to establish the crime with which he is charged. The prisoner's presence at, and participation in the crime charged, are affirmative, material facts that the prosecution must show beyond a reasonable doubt to sustain a conviction. For the prisoner to say he was not there is not an affirmative proposition; it is a denial of the existence of a material fact in the case. (W) It is only necessary for the prisoner in his defense to produce such an amount of testimony, *Page 385 
whether by evidence tending to show an alibi or otherwise, as to produce in the minds of the jury a reasonable doubt of his guilt. (X).
"Now, bearing in mind that the burden rests upon the State throughout the trial to prove the prisoner guilty beyond a reasonable doubt, I charge you if upon a consideration of all the evidence in the case, it leaves a reasonable doubt in your mind, then he would be entitled to a verdict of not guilty, and it would be your duty to so find."
To the parts of the charge in brackets in capital letters, defendant excepted and assigned as error. We cannot, under the facts and circumstances of this case, hold same to be error. In Wharton's Criminal Evidence, 10th ed., sec. 333, in part, pp. 673-674: "The defense of an alibi not only goes to the essence of guilt, but it traverses one of the material averments of the indictment, namely, that the defendant did then and there the particular act charged. It is not an affirmative, nor an extrinsic defense. The presence of the accused at the time and place must be shown as essential to the commission of the crime. To hold that where the accused, by the evidence of an alibi, has cast a reasonable doubt on the averment of his presence and participation, he must be convicted unless he establishes his noncooperation by a preponderance of proof, is to confound burden of proof with the presumption of innocence. When his proof is in, the final question remains, are the essential averments of the indictment proved beyond a reasonable doubt? If this question cannot be answered affirmatively, the accused is entitled to an acquittal, without regard to the manner in which such doubt was raised, whether by evidence or lack of evidence or any other factor in the case. The rule that the burden of proof never shifts, in criminal cases, applies to the defense of an alibi, which need only be proven so as to raise a reasonable doubt as to whether or not the accused was present when the crime was committed. It is error to charge the jury that the alibi must be established by a preponderance of proof, because the evidence offered as to the alibi is to be considered only in connection with all the other evidence adduced, to determine whether, on the whole case, the guilt of the defendant has been established beyond a reasonable doubt. To hold that the accused must, by his evidence, cover the exact time and the whole time during the commission of the crime charged, is error, the general rule being well established that evidence of absence is relevant and competent, even though it does not cover the exact time nor all of the time. Insufficiency of the evidence is not sufficient to exclude its consideration, as the final question of its sufficiency to raise a reasonable doubt is for the jury to determine from all the evidence."
In S. v. Jaynes, 78 N.C. 504 (506), we find: "It is not `essential' to the successful proof of an alibi, that it should cover the whole time of the occurrence. Whether it covers the whole, or a part only, the *Page 386 
effect of the evidence is a matter for the jury and they may give it the weight they may think it entitled to. The evidence was competent and therefore admissible, and it was an invasion of the province of the jury to tell them that unless the proof covered the whole time of the transaction, it lacked the essential element of successful proof. The burden of proving an alibi did not rest upon the prisoner. The burden remained upon the State to satisfy the jury upon the whole evidence of the guilt of the prisoner. It was only necessary for the prisoner in his defense to produce such an amount of testimony, whether by evidence tending to show an alibi or otherwise, as to produce in the minds of the jury, a reasonable doubt of his guilt."
In S. v. Bryant, 178 N.C. 702 (707), it is said: "The judge's charge on the question of the alibi was, it seems to us, not prejudicial to the defendant. He charged substantially that the prisoner relies upon an alibi, which means that he was not, and could not have been at the place of the homicide when it was committed, as he was elsewhere at that time. He is not required to satisfy you of the alibi beyond a reasonable doubt, but if the jury is satisfied from the evidence that he was not at the place when the homicide was committed, and at the time when the deceased met her death, then a verdict of not guilty should be returned, etc., but if the jury is not satisfied, then it is for the jury to consider all the evidence and say whether or not they are satisfied from the evidence, beyond a reasonable doubt, that the prisoner killed the deceased, etc. This instruction was not erroneous but followed our decisions. S. v. Jaynes, 78 N.C. 504; S. v.Reitz, 83 N.C. 634; S. v. Starnes, 94 N.C. 973; S. v. Freeman, 100 N.C. 429;S. v. Rochelle, 156 N.C. 641."
A defendant is entitled to instruction on alibi without special prayer.S. v. Melton, 187 N.C. 481; C.S., 564; S. v. Steadman, 200 N.C. 768
(769).
The fifth contention of defendant: Should the court have set the verdict aside on account of the prejudice and ill will of one of the jurors toward the prisoner? Affidavits to the effect, were presented to the court below by the defendant, who asked for a new trial on the ground that one of the jurors had expressed an opinion that the defendant was guilty before he was sworn and empaneled to try the case. The affidavits were presented to the court about 5:00 o'clock p.m., 16 December, 1933, the court was about to expire by limitation of law. The juror, that the charge was made against, was in the courthouse at the time. In the record is the following: "The court would have to proceed to judgment, and that it would treat the affidavits of the State as being in denial of said affidavits of the prisoner, and that the same could be filed the following Monday, if the solicitor so desired, as of Saturday, 16 *Page 387 
December, 1933. That the affidavits filed by the State, bearing date of 16 December, 1933, were in fact executed and filed on Monday, 18 December, 1933. That before pronouncing judgment, the court announced that it would find as a fact that the prisoner was not prejudiced in his trial by reason of such alleged misconduct of the juror May, and so held."
The record imports verity: "Upon the coming in of the verdict, the prisoner moves to set the same aside and for a new trial, upon the ground set forth in the affidavits filed upon which he bases his motion, and for errors already assigned and hereafter to be assigned. Whereupon, the court finds the following facts: That the juror, Jack May, who is alleged to have made the statement prior to his selection as a juror, as set out in the affidavits of O. M. Scroggs and Lloyd Parham, together with each juror finally selected, was thoroughly examined when called and before he was chosen as a juror, and by answers made to all interrogations by both the State and the prisoner, fully qualified himself as a fair and impartial juror. That the said Jack May is a man of high character, as indicated by the numerous affidavits filed, and is a man of intelligence and standing in his community. And the court being of the opinion that the prisoner was not prejudiced in his trial by the matters set forth in said affidavits and in said findings of fact, the motion of the prisoner for a new trial on said grounds is overruled and the prisoner excepts."
In S. v. Levy, 187 N.C. 581 (588), is the following: "Challenges to the polls, or objections to individual jurors, must be made in apt time, or else they are deemed to be waived. It is too late after the trial has been concluded. In capital cases a challenge propter defectum or propteraffectum should be made as the juror is brought to the book to be sworn and before he is sworn. S. v. Davis, 80 N.C. 412. The fact that an incompetent juror was permitted to sit on the case does not vitiate the verdict. S. v. Upton, 170 N.C. p. 771. But when the incompetency is not discovered until after the verdict, it is then discretionary with the judge presiding as to whether he will, under the circumstances, order a new trial, and his action in this respect is final. S. v. Lambert,93 N.C. 618."
In S. v. Cox, 202 N.C. 378, (380), speaking to the subject: "The law applicable to the decision of this question is well settled. In Goodman v.Goodman, 201 N.C. 808, 161 S.E. 868, it is said by Stacy, C.J., that rulings of the Superior Court on matters addressed to the discretion of the court, which involve no questions of law or legal inference, are not subject to review on appeal to this Court. Numerous cases in which this principle has been applied are cited in the opinion in that case. The motion for a new trial on the ground of newly discovered evidence, whether made at the trial term, or at a subsequent *Page 388 
term, of the court in cases where the motion may be made and allowed or disallowed at such term, are addressed to the discretion of the court. The order allowing or disallowing the motion is not subject to review by this Court; it is made in the discretion of the judge and is conclusive, when made in a criminal action, on both the State and the defendant. S. v.Branner, 149 N.C. 559, 63 S.E. 169."
The matter complained of by defendant was in the sound discretion of the court below and not subject to review by this Court. We have examined with care all the exceptions and assignments of error made by defendant and think they cannot be sustained. Some of them are premised on facts that we do not think susceptible from the record. Some of the exceptions and assignments of error relate to contentions. The whole matter was one mainly of fact for the jury. In the record, we can find no prejudicial or reversible error.
No error.