## STATE v. JAKE BRYANT.

(Filed 15 October, 1919.)

**1. Homicide—Murder—Evidence—Circumstantial Evidence—Nonsuit—Trials —Questions for Jury.**

Upon the trial for a homicide, there was evidence tending to show that the defendant, while married to another woman, had unlawfully been living with the deceased; that preceding her death he had quarreled with her, and on the day thereof visited her house in an ill humor and told her, "We had just as well have a war here as to go to France and have it"; asked her to follow him to a place near by, which she did; was never seen alive thereafter, and her body was found, with the throat cut, in a thicket near the place the defendant had designated for their meeting. There was further evidence that deceased had a sum of money in her stocking, in anticipation of taking a journey, and, among other things, a ring on her finger the defendant had given her, and that when her body was found the stocking of the deceased was turned down, the money missing, as also was the ring deceased had given her. There was further circumstantial evidence that the deceased had had her throat cut with a knife she had been carrying, after having voluntary sexual intercourse with the defendant: *Held*, sufficient circumstantial evidence to show that the deceased had not committed suicide, but that she was murdered by the prisoner, and to sustain a verdict of murder in the second degree.

**2. Homicide—Murder—Opinion—Collective Facts.**

The testimony of a witness describing the situation, the surroundings and appearance of the place of the homicide for which the prisoner was on trial, is proper to be considered in connection with the circumstantial evidence in this case tending to show his guilt, and comes within the rule that instantaneous conclusions of the mind derived from a variety of facts presented to the senses at one and the same time, and descriptive of places and things, are admissible. *S. v. Spencer*, 176 N. C., 709, and other like cases, cited and applied.

**3. Appeal and Error—Instructions—Evidence—Corrections—Consent of Appellant—Harmless Error.**

Where, upon the trial of an action, the judge announced that he will grant a new trial for an error he considered that he had committed in admitting evidence, and the defendant insisted that the trial continue, and the judge instructed the jury to disregard such evidence: *Held*, the defendant has no ground to complain that this course was accordingly pursued.

STATE *v.* BRYANT.

**4. Homicide— Murder— Criminal Law— Alibi— Burden of Proof— Instructions.**

On the trial of an indictment for a homicide, an instruction that the defendant must satisfy the jury of the alibi on which he relies in his defense, is not erroneous or prejudicial, when coupled with the additional instruction to the effect that if the defendant has failed to do this they must then inquire as to his guilt, and if they are satisfied of the same beyond a reasonable doubt, they will return a verdict of guilty, and if not so satisfied, they will return a verdict of not guilty, approving *S. v. Freeman,* 100 N. C., 429, and other cases cited, as to correct rule regarding the proof, or failure of proof, where defendant relies on an alibi.

INDICTMENT for murder, tried before *Calvert, J.,* at March Term, 1919, of BRUNSWICK.

The defendant was indicted for the murder of Susie Spicer, and was convicted of murder in the second degree. From the judgment upon the verdict he appealed to this Court.

There is no doubt that there was evidence of the *corpus delicti,* so the principal question in the case is, Who killed Susie Spicer? The State's evidence is circumstantial, while the defendant set up an alibi. If the State's evidence was believed by the jury, and they made the proper deductions therefrom, then he was properly convicted; whereas, if they believed defendant's evidence, there was no time in which he could commit the murder, which was unaccounted for.

The principal circumstances upon which the State relied to justify the verdict of guilty were as follows:

There were intimate relations between the deceased and the defendant, extending over a considerable period of time prior to the homicide. When the defendant went to Beaufort for work, the deceased accompanied him, and they lived together there. At this time, the defendant admitted in his testimony, he was married, but while he was in Beaufort his wife was at home with her folks, and died there. In March or April the defendant went to Beaufort and stayed there until 6 July. He also stated that on 3 September of the same year (1918), he married Frances Livingstone in Wilmington. On the afternoon of Saturday, 21 September, 1918, he was at the house of Florence Hendricks, the mother of the deceased, where deceased also lived. There was an interview between them there, and the defendant told the deceased to meet him at Burton's crossroads. He went off in the direction of the crossroads and the deceased soon followed. She was seen no more alive, and her body was found the following Monday morning in a thicket near the crossroads. The deceased was soon to leave for Philadelphia, and had made preparations for leaving on Monday, the 23d, which was probably known to defendant. She had money, which was usually carried in her stocking, and no money was found on her person or about the house after her

death; and when found, one stocking was pulled down, the other being in place. When defendant called at the house to see deceased he was in a bad humor, at least. He said to the deceased: "Meet me at Ed. Burton's crossroads. We had just as well have a war here as to go to France and have it." He then went out at the gate and up the road towards Burton's crossroads, and the deceased soon followed him, going in the same direction. The prisoner had given the deceased a ring, which she wore with other rings, and, when she was found all the rings were in place except the one ring that deceased had given her. The prisoner's finger-nails on the left hand were trimmed to the quick; those of the right hand were long. The Hendrick's house was about 250 yards from where the body was found, and it was about three-quarters of a mile from where the body was found to the defendant's house at the mill, near Lanvale. The prisoner was seen at home lacing his shoes late in the afternoon by George Morriss, and he wore different clothes from those he had on at the home of Susie Spicer, the deceased, a few hours before; and, on the search by the officer in his house, no clothing of defendant could be found. Defendant's conduct, when asked to assist in the search for Susie on Sunday afternoon, was thus described by the witness, Ed. Burton: "I told Jake, the defendant, 'Susie is missing. I feel uneasy about her. Won't you come and help me hunt her?' Jake said 'Yes,' and they walked with me to Lanvale station. When we got about 200 yards from the fence where we started, Jake said, 'Now, Ed., if there is anything the matter, I am expecting the blame to be put on me.' I said, 'Well, I don't accuse you of anything. I don't know where the woman is.' He said, 'I have been around there so much, if there is anything the matter, the blame will be put on me.'" He was in a visibly unnerved condition when he talked with Florence Hendricks on the train Sunday afternoon, the day after the homicide, and also when examining the knife before Coroner Boyette.

There was some evidence of robbery. Susie Spicer was preparing to go to Philadelphia on Monday, the 23d. She had at least $40, to her mother's knowledge, and usually kept her money in her stocking. When her body was found that Monday morning, the witness, Dr. Boyette, testified: "The right foot was pushed out and the knee kind of turned up and her stocking was below the knee. The right stocking was down. The left stocking was intact. Her leg was perfectly straight." The State contended that this evidence pointed to the defendant, a man who had been intimate with her, and who must have known where she kept her money, as the murderer, particularly when taken in connection with the missing ring, referred to above.

There was testimony of Dr. Boyette, and other witnesses, who viewed the body and its surroundings, before it was moved, which tended to

refute any suggestion of suicide.  This evidence also tended to show that there had been sexual intercourse by consent between the parties. before the murder.  The act of copulation had taken place about fifty yards from the place the body was found.  After this, it appears that the parties had gone about fifty yards towards the road.  One of them sat down at the root of a gum tree.  The State contends that it is quite likely there was a quarrel here between the parties, there being evidence that Susie Spicer, the deceased, carried the knife with her from her home; that in the quarrel she may have attempted to use it upon the defendant, who, grasping her wrist and wringing it from her, threw her upon the ground and cut her throat.  The jury seems to have taken this view of the case, convicting the prisoner of second degree murder.

The State further contends that the killing could have been done, and the defendant have been at Evan's store in Lanvale at 3 o'clock the same afternoon, as the distance from the place where the body was found to this store, as estimated by the witnesses, was three-fourths of a mile; in other words, about ten minutes for a moderately rapid walker.  George Morriss, who, the State contends, seems to have been perhaps the most intelligent of the negro witnesses, and not connected with any of the parties, says:  "On the Saturday she was missing, I went from my work (railroad section) between 1 and 2 o'clock.  I passed by the home of Susie and saw Jake Bryant and her two little boys there.  Jake was eating grapes under an arbor.  I stopped and talked with him about twenty minutes.  I did not see Susie at this time."  The State further contends that it is evident the time referred to by George, he being a railroad hand, was new time, so that, compared with the time used by all the other witnesses, he was at Susie's house between 12 and 1 o'clock.  It was after this that Jake went off and Susie followed him.  But, as the State insists, assuming that an hour intervened between the time that Morriss saw the defendant at the deceased's house and the time that Needham saw him at Evans' store at Lanvale, said by the witnesses to have been 3 or 3:10 p. m., there would have been ample time for the murder to have been committed and the defendant afterwards to have gone to Lanvale.  Of course, if Needham's watch had been set by sun time, there would have been two hours instead of one, and it is noticeable that all the witnesses for the defense are evidently alluding to sun time. To them the mill whistle blew at 5 o'clock.  To account for the interval of time not accounted for by the other witnesses, the defendant introduced an old colored woman, named Mary Anderson.  She does, if believed, account for it, but the jury refused to yield any credence to her testimony on this point.  It does seem to have. been "tongued and grooved" to fit in with defendant's own testimony.  The same may be said with reference to the testimony of Turner Hazel and Ivey Hobbs.
45—178

The deceased by no possibility could have been sitting on her front porch dressed in silk the afternoon of 21 September, about 3:45 o'clock. There was evidence of threats to break her neck made by the prisoner against deceased prior to the time of the homicide, and of his angry words heard by one of the witnesses at a distance from the two, and that the woman was crying.

This is the material evidence, and the contentions of the State, based thereon, to identify the prisoner as the murderer. The State, therefore, insisted that the motion for a nonsuit was properly overruled.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Cranmer & Davis for defendant.*

WALKER, J., after stating the case: We have stated above only those facts which the evidence tended to prove, and which are material to the case upon the motion to nonsuit. We do not see how we could well decide that there was no evidence of the prisoner's guilt. It is true that the evidence was circumstantial, but sometimes, and not infrequently, such evidence is of the most convincing character. The prisoner was the last person who was seen with the deceased before the homicide was committed; she followed him, at his request, to the place named by him for their meeting, Burton's crossroads, and, for some reason, not disclosed, they had quarreled, for he said to her, when he asked her to meet him at the crossroads, "We had just as well have a war here as to go to France and have it." She followed him, and was not seen again until her body was found in a thicket near the crossroads. The jury might have fairly and reasonably inferred that they had a difficulty of some kind, and that he was the aggressor, but they took a milder view of the facts, and reduced the grade of the homicide to the second degree. There was ample evidence to prove that the deceased had been killed; that she did not commit suicide; and further, that she was murdered by the prisoner. And this is true, without considering the testimony as to his conduct, the missing money and ring, and what the prisoner said after the homicide had been committed.

The facts in *S. v. Bridgers,* 172 N. C., 879, if stronger to support a verdict of guilty in that case than those we have here, are very slightly stronger, and not enough so, to prevent that case, where the conviction was sustained, from being an authority in support of our present conclusion. It would unreasonably extend the discussion if we attempted any further statement or analysis of the evidence. There is so plainly sufficient evidence for the jury that any further comment would add nothing to the force or strength of the evidence itself.

STATE v. BRYANT.

· The objections to the testimony of Dr. Boyette, describing the situation, surroundings, and the appearance at the place of the homicide, and also the condition of the deceased's person, were properly overruled. "The instantaneous conclusion of the mind as to appearance, condition, mental or physical state of persons, animals and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence." *S. v. Leak,* 156 N. C., 643; *Renn v. R. R.,* 170 N. C., 128; *S. v. Spencer,* 176 N. C., 709. This covers also several of the other exceptions.

The judge admitted evidence of a difficulty between deceased and defendant on 6 July preceding. Afterwards, having convinced himself that he had erred in this, he announced that he would order a mistrial. Defendant's counsel insisted that the trial should go on, and that they would be perfectly content with his Honor instructing the jury to disregard this testimony. He did so; instructed them at the time, and again in his charge. If there was any error in this it was clearly not against the defendant. *S. v. Johnson,* 176 N. C., 722. The same may be said as to that part of the charge in which he told the jury they might consider evidence of defendant's not fleeing, when he had an opportunity to do so, as a circumstance in his favor. 2 Wharton's Evidence in Criminal Cases, p. 1498.

The judge's charge on the question of the alibi was, it seems to us, not prejudicial to the defendant. He charged substantially that the prisoner relies upon an alibi, which means that he was not, and could not have been at the place of the homicide when it was committed, as he was elsewhere at that time. He is not required to satisfy you of the alibi beyond a reasonable doubt, but if the jury is satisfied from the evidence that he was not at the place when the homicide was committed, and at the time when the deceased met her death, then a verdict of not guilty should be returned, etc. But if the jury is not so satisfied, then it is for the jury to consider all the evidence and say whether or not they are satisfied from the evidence, beyond a reasonable doubt, that the prisoner killed the deceased, etc. This instruction was not erroneous but followed our decisions. *S. v. Jaynes,* 78 N. C., 504; *S. v. Reitz,* 83 N. C., 634; *S. v. Starnes,* 94 N. C., 273; *S. v. Freeman,* 100 N. C., 429; *S. v. Rochelle,* 156 N. C., 641.

The question as to the voices heard by the witness, R. L. Garrison, and whether they were those of the prisoner and Susie Spicer, was for the jury to determine upon all the evidence relating thereto. The jury might well have found that they were the voices of those two persons, and that the prisoner was threatening the deceased, and using angry and abusive language addressed to her.

The other exceptions to evidence have no merit, and require no discussion. The objections to the charge of the court and to the refusal to give instructions are entirely too general to be considered. *McKinnon v. Morrison,* 104 N. C., 354, and the cases cited in Anno. Edition. See, also, *Hendricks v. Ireland,* 162 N. C., 523; *S. v. Herron,* 175 N. C., 754, at p. 759. A general, or what has been called a "broadside attack" on the charge of the court will not do. The error must be specified, both as to the charge and the failure to give all of the instructions, when there is more than one, for if any of the instructions in the charge is correct (and that surely is the case here), or any of the requested instructions should not have been given, the exception fails. *S. v. Ledford,* 133 N. C., 714; *Nance v. Telegraph Co.,* 177 N. C., 313, at p. 315; *S. v. Evans, ib.,* 564, at p. 570.

We have carefully considered and reviewed this case, and have not been able to discover any error therein.

No error.