STATE *v.* LANCEY STERLING AND GEORGE DAVIS.

(Filed 10 December, 1930.)

1. **Criminal Law G i: G p—Testimony that when arrested defendant had appearance of having recently shaved held competent on question of identity.**

   Where the identity of the defendant is at issue on a trial for murder as the one who entered a store and shot and killed the deceased while attempting to rob a cash drawer, evidence of the State's witness that she saw him shoot the fatal shot and that he had a beard of several days' growth, who later hesitated in again identifying him upon seeing him

shaved, and of another witness, the officer who made the arrest an hour or so later, that he then appeared as one who had hastily shaved with cold water, is competent as a short-hand statement of a collective fact, and not objectionable as inexpert opinion evidence.

2. **Homicide B a—Evidence that crime was murder in first degree held sufficient.**

Evidence tending to show that the prisoner with another entered a store with intent to rob its cash drawer, and shot and killed the deceased is of an attempt to commit a felony and sufficient to sustain a verdict of murder in the first degree, C. S., 4200, under proper instructions from the court thereon upon conflicting evidence.

3. **Criminal Law L e—Slight inaccuracies in charge, not brought to court's attention in apt time, held not to entitle defendant to new trial.**

Slight inaccuracies in the statement of the evidence in the instructions of the court to the jury will not be held for reversible error when not called to the attention of the judge at the time and the charge substantially complies with C. S., 564.

APPEAL by defendants from *Cranmer, J.*, at March Term, 1930, of NEW HANOVER. No error.

The defendants in this action were tried on an indictment in which they were charged with the murder of John Brown, deceased.

The evidence for the State tended to show that shortly before 11 o'clock, on the night of 4 January, 1930, two men—one a tall yellow negro, the other a small black negro—entered a store in the city of Wilmington, N. C., for the purpose of robbery. The only person in the store when they entered was John Brown, who was employed therein as a clerk. His father, William Brown, was the owner of the store. When the men entered the store John Brown was behind a counter, near the money drawer.

Miss Georgia Brown, a sister of John Brown, testified that she went into the store at about 11 o'clock to speak to her brother. The only persons in the store at this time were John Brown and the two negro men. She saw the tall yellow negro standing in front of her brother, with a pistol in his hand. The counter was between them. The small, black negro was behind the counter, walking in the direction of the money drawer. When she realized the situation, Miss Brown exclaimed to her brother, "John, what is the trouble?" Before he could reply, the tall yellow negro shot him with the pistol. Miss Brown then ran to her brother, saying, "John, have they hurt you?" He replied, "Yes, Georgia; run before they shoot you." When the pistol was fired by the tall yellow negro, the small black negro ran from behind the counter, and out of the store. As Miss Brown started to the telephone in the store, the tall yellow negro followed her, with a bag in his hands. Ap-

prehending that he was about to assault her, she screamed, and he ran out of the store. Both men escaped, and Miss Brown called the police headquarters over the telephone. When the officers arrived at the scene, they found that John Brown had been mortally wounded. They took him to the hospital, where he died soon after his arrival there. His death was the result of the wound, caused by the pistol fired by the tall yellow negro, while the small black negro was behind the counter, going in the direction of the money drawer.

Miss Brown testified that she had never seen either of the men whom she saw in the store at the time her brother was shot, before the night of the homicide. However, while testifying at the trial, she identified the defendant, Lancey Sterling, as the tall yellow negro who shot her brother. She said, "I now identify the defendant, Lancey Sterling, as the man who shot my brother."

This defendant was arrested on Sunday morning, between 8 and 9 o'clock, because of the description given to the officers by Miss Brown the night before, immediately after the homicide, of the man who shot her brother. When she first saw the defendant in the custody of the officers, at the jail, she hesitated to identify him positively, because he did not then have a beard. She had stated to the officers, and so testified at the trial, that the man who shot her brother had a beard, apparently of three or four days growth, on his face. There was evidence tending to show that the defendant went to his home on the night of the homicide after 12 o'clock; and that between this time and the time of his arrest the next morning, he had shaved himself. One of the officers, who arrested the defendant at the home of his mother, testified that his face, at the time of the arrest, "appeared to be the face of a man who had taken a hasty shave with a dull razor in cold water."

Miss Brown testified that she could not identify the defendant, George Davis, as the small black negro whom she had seen behind the counter, going in the direction of the money drawer, when she went into the store on the night of the homicide, and who ran out of the store, when the pistol was fired. She had never seen this man before, and could only testify that he was a small black negro.

Ben Johnson, a witness for the State, testified that he had known the defendant, George Davis, for about fifteen years—for about three years in the city of Wilmington, and prior to that time in South Carolina and Georgia. He saw the defendant on Sunday morning after the shooting of John Brown on Saturday night. The defendant then told the witness that Mr. Brown's son, John, had been shot and killed in his father's store the night before. The witness next saw the defendant in Wilmington on the following Wednesday evening at about 6 o'clock. On this occasion the defendant told the witness that he was in the store when

John Brown was shot; that he had met a man on the street near the store that night; that in consequence of his agreement with this man, he went with him to the store; that the man held up John Brown with a pistol, and that he had started behind the counter to get the money from the money drawer; that then the girl came in, the man fired his pistol, and he got scared and ran out of the store.

Joe Nick Byrd, a witness for the State, testified that he had known the defendant, George Davis, for about two months before the homicide; that on the night of the homicide the defendant was at his store, from about 8 o'clock until some time after 10 o'clock; that soon after 8 o'clock the defendant went to Mr. Brown's store, which is near the witnesses' store, on an errand for the witness; that he returned to witnesses' store and remained there until about 10 o'clock; that about 10 o'clock defendant went on another errand for witness, and returned at about 11:30, and that he remained at his store for several hours after his return. The witness first heard of the homicide at about 12:30 that night. The witness could not say whether or not the defendant was at his store when some men came in and told about the homicide; he could not remember as to this.

The defendant, George Davis, was arrested at a lumber camp several miles from the city of Wilmington, on Wednesday or Thursday night after the homicide. The arrest was made because of information received by the officers as to his statement to Ben Johnson. After the arrest the defendant was taken to the jail in the city of Wilmington, where a warrant charging him with the murder of John Brown was served on him. The officer who served the warrant testified that after he had read it to the defendant, the defendant said, "My God, Mr. Tindall, what do you think they are going to do with me?" The officer replied that he did not know. The defendant then said, "I didn't kill the man." Subsequently, while confined in jail, the defendant, in the presence of the defendant, Lancey Sterling, said to the officers, "Lancey Sterling is the man who shot John Brown." Lancey Sterling replied, "I have not shot anybody." The defendant then said, "You did; you have the same cloth around your head now that you had on your head the night you shot him."

The defendant, George Davis, did not testify as a witness at the trial.

The defendant, Lancey Sterling, testifying in his own behalf, denied that he shot John Brown, and denied that he was in the store when John Brown was shot. He testified that on the night of the homicide he was at his mother's home in the city of Wilmington from about 10 o'clock until after 12, when he went to his home. He offered the testimony of several witnesses as evidence in support of his alibi. He testified that when the defendant, George Davis, said in his presence and in

the presence of the officers, that he was the man who shot John Brown, he replied to him, "For God's sake, look at me. I never saw you before in my life."

At the conclusion of all the evidence, and after the charge of the court to the jury, the jury returned the verdict appearing in the record, to wit: "Guilty of murder in the first degree, as to both defendants."

From the judgment that each defendant suffer death by means of electrocution, as provided by statute, both defendants appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*George Rountree, Jr., for defendants.*

*John Q. LeGrand and Newman & Sinclair assigned by the Court for defendant, George Davis.*

CONNOR, J. Miss Georgia Brown, sister of the deceased, John Brown, and the only witness for the State, as shown by all the evidence, who was present at the time the deceased was shot and killed, testified that the man who shot and killed the deceased had a beard, of apparently three or four days growth, on his face. All the evidence was to the effect that at the time of his arrest, which was within a few hours after the homicide, the defendant, Lancey Sterling, who was identified by Miss Brown as the man who shot her brother, had no beard on his face. The evidence for the State tended to show that he had recently shaved. The evidence for the defendant was to the contrary. One of the officers who made the arrest, in his direct testimony, said: "Lancey's face appeared to me as the face of a man that had taken a hasty shave with a dull razor in cold water."

The case on appeal does not show that this statement was made by the witness in response to a specific question addressed to the witness by the solicitor. The record shows that counsel for defendant objected to the statement, saying: "That is merely an opinion." To this the court replied: "That is what has been called a shorthand statement of facts." To this defendant excepted. His assignment of error based on this exception cannot be sustained. As was said in *S. v. Skeen,* 182 N. C., 844, 109 S. E., 71, this was only a shorthand method of giving the facts as they appeared to the witness. In that case, the statement of the witness, in describing the appearance of the defendant, was, "His clothes were damp—shoes muddy—looked like. Didn't look like they had been unlaced in several days." It was held that it was proper for the witness to state the instantaneous conclusion of his mind, from his observation of a variety of facts presented to his senses at one and the same time.

The principle is stated and approved in *Willis v. New Bern,* 191 N. C., 507, 132 S. E., 286. See, also, *S. v. Gray,* 180 N. C., 697, 104 S. E., 647; *S. v. Bryant,* 178 N. C., 702, 111 S. E., 430; *S. v. Harden,* 177 N. C., 580, 98 S. E., 782; *S. v. Spencer,* 176 N. C., 709, 97 S. E., 155; *S. v. Leak,* 156 N. C., 643, 72 S. E., 567. In the last case cited, the principle as stated in McKelvey on Evidence, p. 220, *et seq.,* is approved by this Court. On this principle there was no error in overruling defendant's objection to the statement of the witness on the ground that it was merely an expression of his opinion. In passing upon this assignment of error, we interpret the record as showing in effect that defendant's counsel moved to strike out the statement, and that the motion was denied.

The sole question involved in the issue submitted to the jury at the trial of this action was one of identity. The uncontradicted evidence for the State shows that the homicide was murder. There was no evidence tending to show that the homicide was manslaughter, or that it was justifiable or excusable. All the evidence showed that the murder was committed in an attempt to perpetrate a felony, to wit, robbery. The homicide was, therefore, murder in the first degree, as defined by statute. C. S., 4200. On the authority of *S. v. Spivey,* 151 N. C., 676, 65 S. E., 995, approved in *S. v. Newsome,* 195 N. C., 552, 143 S. E., 187, the court might well have so instructed the jury, leaving the question as to the guilt of the defendants to be determined by the jury, under the instructions of the court, from the evidence. There was conflicting evidence as to the identity of the defendants, as the men who committed the murder, while attempting to perpetrate a robbery. This evidence was submitted to the jury under a charge which we find free from error. Slight inaccuracies in the statement of the evidence by the court in its charge to the jury, not called to its attention at the time, cannot be held as prejudicial error. In the instant case the charge was in substantial compliance with C. S., 564. The contentions of each defendant, as well as those of the State, upon the conflicting evidence, were fully and fairly stated by the court. The verdict is fully supported by the evidence, and we find no error in the record, for which either defendant is entitled to a new trial. The judgment is affirmed.

No error.