STATE OF NORTH CAROLINA v. THOMAS CARTER

No. 8314SC414

(Filed 17 January 1984)

1. **Criminal Law § 166— criminal appeal—court-appointed counsel only may sign brief**

    In any criminal case where the defendant is found to be indigent and receives the services of court-appointed counsel it is only the specifically named counsel (and not the law firm or associates) that has the delegated right and duty to appear and participate in the case; therefore, it was inappropriate for another attorney to sign the brief along with the court-appointed counsel.

2. **Criminal Law § 131.2— motion for appropriate relief—discovery of new evidence**

    There was no abuse of discretion in the denial of defendant's motion for appropriate relief which alleged the discovery of new evidence which revealed that, since the trial in which defendant was convicted of second degree murder, defense witness Upchurch made three separate confessions admitting

State v. Carter

that he alone committed the murder with which the defendant was charged and that he gave false testimony as a witness when he inculpated defendant Carter. Defendant failed to show that the newly discovered evidence was probably true in that Upchurch made the statements to cellmates of his in the county jail who were "getting on him about being a snitch" and the record evidence of Upchurch's recanting, confessing, tattling, or snitching, was not presented as having been done in remorse and to keep an innocent man from pulling time for a crime which he did not commit.

3. **Criminal Law § 117— failure to instruct on witness's prior inconsistent statements and prior convictions—proper—defense witness**

The trial court did not err in limiting defendant's examination of his own witness concerning prior inconsistent statements and prior convictions, and the trial court did not err in refusing to instruct the jury regarding the same matter since a party calling a witness may not impeach that witness and since there was nothing in the record to indicate that defendant was surprised by his own witness's testimony. Further, defendant was not prejudiced by the court's limiting his examination since defendant elicited testimony of similar import without objection.

4. **Criminal Law § 71— opinion concerning wetness of towels—properly admitted**

A witness's testimony that a towel "was wet like someone had used it to dry . . . themselves off after a shower or a bath," was a shorthand statement of fact, and was not an impermissible expression of opinion.

5. **Criminal Law § 53— testimony as to time of death—properly admitted**

The trial court properly allowed a physician to state his opinion as to the time of death of the victim where the record shows that the physician was a medical examiner, had frequently been called to determine the time of death in homicide cases, related to the jury the factors and medical concepts considered in determining the time of death and what he did in this particular case, and stated that he had examined the body at the scene.

6. **Criminal Law § 42.5— admission of towel into evidence—proper**

The trial court properly admitted into evidence a bloodstained towel found under a lifeguard stand at a park's swimming pool which was located approximately 100 yards from where the victim's body was found where there was sufficient evidence to connect the bloodstained towel to defendant.

7. **Criminal Law § 55.1— bloodstain tests performed on defendant's shirt—results properly admitted**

The trial court properly admitted the results of a bloodstain test performed upon defendant's shirt where an analyst testified the results were inconclusive, and where from previous testimony, the jury knew that the defendant's bloodstained shirt had been found at the scene.

ON a writ of certiorari to review Judgment of *Clark (Giles R.), Judge.* Judgment entered 2 March 1982 in Superior Court, DURHAM County. Heard in the Court of Appeals 1 December 1983.

*Attorney General Edmisten by Assistant Attorney General Grayson G. Kelley, for the State.*

*R. Hayes Hofler, III, for the defendant.*

BRASWELL, Judge.

The jury convicted Thomas Carter of second-degree murder. Mark Upchurch testified that Carter committed the crime. Strangely, it was Carter, and not the State, who called Upchurch to be a witness. Both men had been indicted for the murder of Cynthia Easterling on the night of 17-18 August 1981 at Duke Park in Durham. Only Carter was on trial. The guilty verdict occurred on 23 February 1982 and prayer for judgment was continued. On 26 February 1982, Carter filed a motion for appropriate relief. On 2 March 1982 the motion was denied, active sentence was entered to the presumptive term of 15 years, and Carter appealed.

[1]   On 5 November 1982 the original court-appointed counsel for the trial and for the appeal, William Sheffield, was removed by order after a hearing. R. Hayes Hofler, III, was then appointed as counsel to perfect the appeal. [To assure that case and client responsibility is with the court-appointed counsel, we note that Attorney A. Neil Stroud also signed the brief filed in this court for the defendant. The record fails to show any right in Mr. Stroud to appear as counsel. In any criminal case where the defendant is found to be indigent and receives the services of court-appointed counsel it is only the specifically named counsel (and not the law firm or associates) that has the delegated right and duty to appear and participate in the case. We recognize that signing of the brief is authorized under the circumstances permitted in Rule 33(a) of the Rules of Appellate Procedure. However, Rule 33(a) is not applicable in criminal cases involving court-appointed counsel. Why? (1) In the legal process of appointing counsel, the only attorney or attorneys ethically or duty-bound to perform the services of counsel are those specifically included by name in the court's order of appointment. (2) It is the State that pays the attorney fees, and the State is obligated only to those it has appointed to the work. (3) In post trial motions for appropriate relief the indigent defendant can assert that the non-court-appointed-by-name counsel performed ineffective services,

or failed to ever talk to defendant in the attorney-client relationship, or, in some instances, pled the defendant guilty when the named court-appointed attorney said to plead not guilty. The naming of an attorney properly fixes the professional responsibility. (4) If the services of additional counsel are justified, procedure by motion, hearing, and order for additional appointment is always available.] Pursuant to other motions and petition the record was docketed in our court on 18 April 1983.

In the "plain-spoken introduction" to his brief, defense counsel argues that this case is indicative of "one of the basic evils our legal system was designed to thwart: the conviction of the innocent while the guilty go free." On the facts before us and the law applicable thereto, we disagree that there has been shown a miscarriage of justice and affirm the conviction.

[2] The thrust of the issue on appeal alleges reversible error in the denial of the defendant's motion for appropriate relief dated 26 February 1982. The motion alleged the discovery of new evidence which revealed that since the trial defense witness Mark Upchurch made three separate confessions admitting that he alone committed the murder with which the defendant was charged and that he gave false testimony as a witness when he inculpated defendant Carter. The people with whom Upchurch talked were William Thomas Hutson, Dennis Covington, and Eric D. Smith, all of whom were incarcerated in the Durham County Jail along with Upchurch and Carter. After testifying against Carter, although called as his witness, Upchurch was returned to the cell block.

We believe that the jailhouse conversations that were testified to during the hearing on the motion for appropriate relief can best be put in perspective by quoting from the direct examination of the defense witness Dennis Covington: "[Upchurch] said everybody in the cell sixteen was getting on him about saying that he was turning state's evidence on Mr. Carter." During the course of the defense evidence the word "snitch" was also used in reference to the conduct of Upchurch.

It is well-settled law that a motion for a new trial on the ground of newly-discovered evidence is addressed to the discretion of the trial court, and the trial court's denial of the motion will not be disturbed absent a showing of an abuse of discretion.

*State v. Beaver,* 291 N.C. 137, 229 S.E. 2d 179 (1976). In reviewing orders of the trial court entered pursuant to hearings on motions for appropriate relief, the scope of our review is to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the trial court's order. *State v. Stevens,* 305 N.C. 712, 291 S.E. 2d 585 (1982). The findings of fact, if supported by evidence, are binding, even if the evidence at the hearing is conflicting. *Id.*

We also point out the rule of law that determines when a person has become a party to a criminal act. *State v. Keller,* 268 N.C. 522, 526, 151 S.E. 2d 56, 58 (1966), cited with approval in *State v. Williams,* 299 N.C. 652, 655, 263 S.E. 2d 774, 777 (1980), holds that

A person is a party to an offense, however, if he either (1) actually commits the offense or (2) does some act which forms a part thereof or (3) if he assists in the actual commission of the offense or of any act which forms part thereof, or (4) directly or indirectly counsels or procures any person to commit the offense or to do any act forming a part thereof. (Numbered parentheses added.)

We first review the evidence that was offered at the jury trial. The State's evidence tended to show that on 18 August 1981, shortly after midnight, Sgt. D. M. Laeng of the Durham County Public Safety Department, while on routine patrol of Duke Park in the City of Durham, discovered a white fabric shoe and a handbag, subsequently identified as belonging to Cynthia Easterling, in the parking lot. Sgt. Laeng investigated further and discovered the defendant sleeping on the bench in the picnic shelter. After awakening the defendant, Sgt. Laeng walked behind the shelter and discovered the badly beaten and semi-nude body of a woman, subsequently declared dead and identified as Cynthia Easterling, lying approximately fifteen feet from the shelter. Sgt. Laeng arrested the defendant and radioed for additional help.

The police conducted a search of the picnic shelter and the area around the victim Easterling's body. Near her body, the police found two sections of a leather belt and a piece of what appeared to be a broken table leg. Near a step behind the shelter

was a four-to-five-inch sliver of wood. Under the window inside the shelter where defendant had been sleeping and near his duffle bag was another section of a broken chair or table leg. [Later, Upchurch testified that Carter used the table leg to beat Easterling around the head.] Hanging in the window as if to dry was a damp pink towel. Laying on a bench in the shelter were a brown shirt with a blood-like spot on the collar and a pair of jeans. Both of these were wet and smelled of chlorine. Found in a duffle bag located next to defendant were defendant's army discharge papers, a damp pair of slacks, a plastic bag containing a wet bar of soap, and a damp washcloth, among other things. Later that morning, at approximately 7:00 a.m., the police found a yellow towel containing blood-like stains on the lifeguard stand at the park swimming pool, which was located approximately 100 yards away from the location of the victim's body. This towel was damp. In the meantime, defendant had been taken to the police station. Defendant's hair was fluffy and damp, and defendant smelled of chlorine. A strip search of defendant disclosed that he had no abrasions or marks except for a "strawberry" abrasion on the back of his shoulder.

Dr. Mary Steuterman, a forensic pathologist and Assistant Chief Medical Examiner of the State of North Carolina, performed an autopsy upon Ms. Easterling. Dr. Steuterman noted that Ms. Easterling sustained multiple lacerations, wounds or fractures to the face, head, neck, chest, ribs, and umbilicus. Dr. Steuterman also noted four pairs of linear bruises on the right leg. She testified that the pattern and size of these bruises indicated that they were inflicted by a thin tubular instrument. In her opinion, the blunt injuries to the head and neck caused Easterling's death.

Mr. William Weis, a forensic serologist, performed blood tests on the blood found on a white sock found near the victim's head; on a belt and buckle belonging to Mark Upchurch and found near the victim, on a brown shirt identified as belonging to defendant and found in the shelter, on a yellow towel found on the lifeguard stand, and on a plaid shirt identified as belonging to Upchurch. Based upon a comparison of known blood samples from the victim, defendant, and Upchurch, Mr. Weis concluded that the blood on each item was consistent with the victim's blood.

Defendant presented an alibi defense and also evidence tending to show that Mark Upchurch killed Cynthia Easterling.

Thomas Potts, Upchurch's brother-in-law, testified for the defendant that he observed Upchurch and Cynthia Easterling leave together in Upchurch's '69 Chevrolet Impala on the evening of 17 August 1981. Upchurch was wearing a pair of blue slacks and a plaid shirt when he left. When Upchurch returned to Potts' house that night around 11:30, Upchurch was wearing a different pair of slacks. Upchurch went into the house and washed his hands twice, the second time continuously for fifteen to twenty minutes. Upchurch's face was red and looked as if he had been fighting. Upchurch told Potts that Cynthia Easterling may be dead and that he needed an alibi.

The next day Potts drove Upchurch's car to work and noticed in the car the clothes Cynthia Easterling had been wearing the night before—a pair of blue jeans, a pair of panties, a shoe, and a pair of sunglasses. After Potts called the police and Upchurch's mother, Potts' wife found a blood-spattered plaid shirt belonging to Upchurch. Potts further testified that Upchurch usually kept a two-and-a-half-foot long black wooden table leg in the back seat of the Impala.

The police searched Upchurch's car and found the items Potts mentioned. In addition, the police searched the trunk and discovered that the tire tool was missing.

Upchurch was brought in for questioning. When confronted with his bloodstained shirt, Upchurch became upset and agreed to give a statement.

Mr. Weis, the forensic serologist, testifying for the defendant, concluded that the numerous blood spots on Upchurch's plaid shirt were consistent with the victim's blood, but inconsistent with Upchurch's or the defendant's blood. The blood spots on Upchurch's shirt and belt were medium velocity spatters indicative of blood being thrown off an object as it was being swung or blood being spattered as when an object hits a pool of blood or a saturated bloody object. The blood pattern on the shirt was consistent with the type of spattering which would result from someone beating a human with a tire tool or some other instrument. The bloodstain on the defendant's shirt, however, in his opinion,

did not look like a spatter pattern but "more of a smear or a transfer from one object to another type of bloodstain."

Tim Carter, defendant's younger brother, testified that defendant was at his house from about 5:45 p.m. to 10:15 p.m. on the evening of 17 August 1981. Bryan and Elizabeth Vann testified that they visited Tim Carter that night, and that defendant Thomas Carter was there when they arrived and when they departed at approximately 10:00 p.m.

Defendant testified that he left his brother's house shortly after the Vanns departed and walked to Duke Park where he had left his duffle bag. The bag had been left out in the rain on a previous day and the clothes in the bag were wet. Before going to sleep, he hung a towel that was in the duffle bag on the window to dry. He also laid a shirt on the bench to lie on because the bench was wet, and laid a stick beside him. He had been asleep approximately two to three hours when the police officer awakened him. He had never seen Cynthia Easterling before and he did not see Cynthia Easterling that evening. The first time he had seen Mark Upchurch was when Upchurch was put into the holding cell with him. He did not go over to the swimming pool that evening.

Defendant also called Mark Upchurch to the stand. Upchurch testified that as he and Cynthia Easterling were parked in a church day care center parking lot "making out," a man whom Easterling  called "Spooky" and whom Upchurch identified at trial as defendant came and got into the car with them. Following the man's directions, Upchurch drove the car to Duke Park, where the man jerked Ms. Easterling out of the car. The man grabbed a table leg from the car and proceeded to beat Ms. Easterling with it. Ms. Easterling broke free and began to run, and the man gave chase, disappearing from Upchurch's view. The man returned shortly to the car where Upchurch had remained, retrieved Upchurch's belt which was hanging on the rear view mirror, and disappeared into the darkness. Upchurch heard slapping sounds in the distance as if someone was being hit with a belt. The man returned to the car a third time and retrieved a tire tool. This time Upchurch followed him and saw the man beat Easterling with a table leg. Upchurch made a grab for the stick,

and noticed that it was bloody. Panicking, Upchurch ran back to the car and sped away.

Based upon the evidence offered by the defendant at the hearing on the motion for appropriate relief the court made the following findings of fact:

1) That Mark Allen Upchurch has also been indicted for the murder of Cynthia J. Easterling, but has not been brought to trial as of the date of this hearing; that Upchurch is being held in custody of Durham County Law Enforcement officials awaiting trial.

2) At the trial of this case the defendant Thomas Carter called Mark Allen Upchurch as his witness; that Upchurch gave testimony on his direct examination which implicated Carter as the perpetrator of the offense charged against Carter; that Upchurch was not joined for trial with Carter.

3) After the jury returned a verdict finding Carter guilty of second degree murder, some of the jail inmates who were being held in the same cell with Upchurch began "getting on him about being a snitch"; that Upchurch informed the other in-

EXCEPTION NO. 28

mates that he had not testified against Carter and that newspaper accounts reporting that he had done so were incorrect; that Upchurch requested some of the inmates to get in touch with Carter and tell Carter that Upchurch knew Carter had nothing to do with the murder, and that Upchurch had done it alone; Upchurch also told some of the inmates that he wanted to get in touch with his lawyer and come down to Court and tell that he had committed the offense; that he did request his lawyer to come to the jail and did confer with him on February 24, 1982; after this conference Upchurch's lawyer filed a motion with the Court questioning the mental capacity of Upchurch to proceed in said matter and requesting that he be given a mental examination and evaluation.

4) That Mark Allen Upchurch was called as a witness at the hearing of this motion and testified that he was in

Durham County Jail on February 23, 1982; Upchurch then invoked his privileges under the 5th amendment of the United States Constitution, and refused to answer any further questions or give additional testimony; no ruling was made by the Court on the ground of privilege, and no effort was made to further compel testimony from Upchurch.

The trial court, based upon these findings of fact, made the following conclusions of law:

[T]hat the new evidence shown by the defendant is of questionable competency, relevancy and materiality;

EXCEPTION NO. 29

that such evidence does not bear sufficient indicia of truthworthiness to merit the award of a new trial as said statements were allegedly made by Upchurch at a time that he was being accused by his cellmates of having "snitched" on Carter, and

EXCEPTION NO. 30

after he had denied testifying against Carter; that such circumstances would

EXCEPTION NO. 31

constitute probable motive for Upchurch to falsify; that such statements allegedly made by Upchurch would constitute declarations against his penal interest and would be of questionable admissibility if a new trial was allowed in view of its doubtful voluntariness and the existence of probable motive for Upchurch to falsify under

EXCEPTION NO. 32

the circumstances in which the statement was allegedly made; that such evidence contradicts, impeaches and discredits the testimony given by Upchurch at the

EXCEPTION NO. 33

defendant's trial at which Upchurch was called as a witness by the defendant; that the Court is unable to conclude from

the evidence offered at the hearing that such new evidence is probably true or that it is of such nature that a different

EXCEPTION NO. 34

result would be reached at a new trial; and that the motion for appropriate relief should be denied on the grounds of newly discovered evidence.

EXCEPTION NO. 35.

To be entitled to a new trial based upon newly-discovered evidence, the movant must establish the following prerequisites:

(1) [T]he witness or witnesses will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the new evidence does not merely tend to contradict, impeach or discredit the testimony of a former witness; and (7) the evidence is of such a nature that a different result will probably be reached at a new trial. [Citation omitted.]

*State v. Beaver, supra,* at 143, 229 S.E. 2d at 183. If the movant fails to show any one of the prerequisites, the motion must be denied. *State v. Martin,* 40 N.C. App. 408, 252 S.E. 2d 859, *disc. rev. denied,* 297 N.C. 456, 256 S.E. 2d 809 (1979).

As indicated by the trial court's conclusions of law, the defendant failed to show that the newly-discovered evidence was probably true. The trial court found as a fact, the only factual finding to which defendant excepted, that some of the cellmates of Upchurch were "getting on him about being a snitch." This finding, however, was supported by the testimony of Dennis Covington, one of the inmates, that he had been asked by Upchurch if he had heard anyone say that he had snitched on Carter, that everyone in his cell was "getting on him" about turning State's evidence against Carter. The record evidence of Upchurch's recanting, confessing, tattling, or snitching, is not presented as having been done in remorse or in order to keep an innocent man from pulling time for a crime which he did not commit. Given the situation of the cell block and jail life, the evidence shows that

Upchurch claimed he was a snitcher for his own well-being. Up-church, therefore, had a motive to recant in order to avoid falling in disfavor with fellow cell mates as a "snitch."

Further, the court found that Upchurch informed the inmates that he had not testified against Carter. Indeed, one inmate testified on cross-examination that Upchurch had denied testifying at all, when in fact he had. Thus, there was ample support in the record for the trial court's conclusion that the evidence probably was not true. This conclusion alone was sufficient to support the trial court's order denying a new trial. *State v. Martin, supra.*

Moreover, as the trial court found, Upchurch refused to testify, invoking his Fifth Amendment privilege, at the post-trial hearing. Consequently, the only sworn testimony during the motion proceedings that Upchurch alone had committed the crime and that Carter had nothing to do with it was the hearsay testimony of three inmates. The testimony of the three inmates merely tended to contradict, impeach, or discredit the testimony of Upchurch that Carter had killed Ms. Easterling, as the trial court correctly concluded.

Also, defendant failed to show that Mark Upchurch would give any newly-discovered evidence. Unless Upchurch did testify at a new trial it would be impossible to get before the jury any of the alleged confessions of Upchurch. Given the circumstances under which the alleged confessions were made, the alleged confessions lack sufficient trustworthiness to be admissible even as declarations against penal interest. *State v. Haywood,* 295 N.C. 709, 249 S.E. 2d 429 (1978). If he testified and denied the confessions, then the newly-discovered evidence could only be used for purposes of impeachment.

[3] Defendant next contends that the trial court erred in refusing to instruct the jury regarding Upchurch's prior inconsistent statements and Upchurch's prior convictions. He also contends that the trial court erred in limiting his counsel's questioning of Upchurch and others regarding Upchurch's prior inconsistent statements and prior convictions on the ground that it restricted his right to confront his accusers.

In refusing to give the requested instructions and in limiting counsel's questioning, the trial court relied upon the long-standing

rule in North Carolina that a party calling a witness may not impeach that witness. *State v. Pope,* 287 N.C. 505, 215 S.E. 2d 139 (1975). An exception to this rule, however, which allows impeachment upon motion and in the trial court's discretion, is when the calling party has been misled, surprised or entrapped to his prejudice by the witness. *Id.* In some circumstances, the trial court may also allow, upon motion and in its discretion, the calling party to cross-examine a hostile or unwilling witness for the purpose of refreshing the witness's recollection, but the calling party cannot cross-examine the witness to show that the witness is unworthy of belief. *State v. Cope,* 309 N.C. 47, 305 S.E. 2d 676 (1983); *State v. Smith,* 289 N.C. 143, 221 S.E. 2d 247 (1976), *death sentences vacated,* 291 N.C. 505, 231 S.E. 2d 663 (1977).

In the present case, the requested instructions and the attempted examination regarding prior inconsistent statements were offered for the purpose of showing that Upchurch, the defendant's own witness, was not believable. There is nothing in the record to indicate that defendant was surprised by Upchurch's testimony. Indeed, one of Upchurch's pretrial statements was largely consistent with Upchurch's trial testimony.

In any event, defendant was not prejudiced by the court's limiting his examination. In many instances defendant elicited testimony of similar import without objection. For example, the defendant excepted to the trial court's refusal to allow Detective Harris to read a statement that Upchurch had given him. However, the court later allowed Detective Harris to relate what Upchurch had told him. In addition, Upchurch admitted when confronted by defendant's counsel that he had made a false statement that this man "Spooky" had borrowed his car and driven Easterling to a Dunkin' Donuts store and had returned without Easterling. Upchurch also admitted that he had changed his testimony from the morning session of court to the afternoon session. The jury, therefore, had plenary material before it from which to gauge Upchurch's credibility. We conclude that there was no impermissible infringement upon defendant's right of confrontation.

Upchurch had a prior conviction for embezzlement. Defendant wanted the judge to instruct the jury, in effect, to scrutinize this evidence as it bore on the jury's finding of the witness's credibility. We hold the trial judge properly denied the request.

It must be remembered that Upchurch was the defendant's witness and not the State's witness. While the law allows a party to *enhance* the credibility of his own witness by evidence that he had no prior convictions, the law does not permit an examination for impeachment of one's own witness to show prior convictions. *See State v. Dellinger,* 308 N.C. 288, 299, 302 S.E. 2d 194, 200 (1983).

Defendant's remaining assignments of error relate to the admission of evidence over defendant's objection. We have carefully examined each of them and find no error.

[4]    First, defendant contends that the court allowed an impermissible expression of an opinion when a police officer described a towel he had found in the picnic area as being "wet like someone had used it to dry [objection interposed and overruled] . . . themselves off after a shower or bath." The witness had just testified that the towel was wet. Merely stating that the towel was wet was not sufficient to inform the jury whether the towel was soaking wet, dripping wet, damp, or perhaps moist with morning dew. Because of limitations of language, it was difficult for the witness to describe the towel's condition in detail. *State v. Smith,* 300 N.C. 71, 265 S.E. 2d 164 (1980). The testimony, therefore, was a shorthand statement of fact, and not an impermissible expression of an opinion. *See State v. McGuire,* 49 N.C. App. 70, 270 S.E. 2d 526, *disc. review denied,* 301 N.C. 529, 273 S.E. 2d 457 (1980); *State v. Sterling,* 200 N.C. 18, 156 S.E. 96 (1930).

[5]    Secondly, defendant contends that the court erred in allowing a physician qualified only as an expert in the field of general medicine to state his opinion as to the time of death on the ground that the opinion was based upon insufficient data. We reject this argument. The record shows that the physician, a Medical Examiner for Durham County since 1971, has frequently been called to determine the time of death in homicide cases, at a recent rate of six per month. The physician related to the jury the factors and medical concepts considered in determining the time of death and what he did in this particular case. He stated further that a determination of the time of death is only accurate to an hour or so of death. Although Dr. Gore did not conduct every conceivable test upon the victim's body, he examined the body at the

scene, and based upon his knowledge and experience, he estimated the time of the victim's death to be 11:45 p.m. This constituted a sufficient basis for his opinion. *See State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied,* 414 U.S. 874, 94 S.Ct. 157, 38 L.Ed. 2d 114 (1973).

[6] Thirdly, defendant contends that the court erred in admitting into evidence a bloodstained towel found under a lifeguard stand at the park's swimming pool which was located approximately 100 yards from where the victim's body was found. Defendant contends that the towel was improperly admitted because there was no evidence connecting the towel to defendant, thus leaving it open to conjecture as to the towel's connection to defendant. There was, however, sufficient evidence to connect the bloodstained towel to defendant. Another towel had been found hanging in the picnic shelter where defendant had been sleeping. Found in or around defendant's duffle bag were a damp pair of slacks, a damp shirt with a blood spot, a wet bar of soap, and a washcloth. The water of the nearby pool had been treated with chlorine; defendant's jeans and shirt and defendant himself smelled of chlorine. One officer testified that defendant's hair was fluffy and damp. This evidence was more than sufficient to connect the towel to defendant.

[7] Finally, defendant contends that the trial court erred in admitting the results of a bloodstain test performed upon the defendant's shirt on the ground that the prejudicial effect of the evidence outweighed its probative value. This contention is without merit. The analyst testified that the results were inconclusive—that the blood spot on the shirt was consistent with the blood of defendant, the victim, and 45% of the general population. From previous testimony, the jury knew that the defendant's bloodstained shirt had been found at the scene. The jury knew that the shirt had been submitted for analysis. With that background the jury had a right to know whose blood was on the shirt. The State was entitled to connect up the results of the testing upon the exhibit. Otherwise, it would have been left to the jury to speculate. We fail to see how defendant was prejudiced by the admission of these results.

For the aforementioned reasons, we find

No error.

Judges HEDRICK and EAGLES concur.